(No. 75813.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDWARD ALPHONS MOORE, JR., Appellant.

*Opinion filed January 18, 1996.—Rehearing denied April 1, 1996.*

80

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and David W. Neal, State's Attorney, of Morris (Rosalyn Kaplan, Solicitor General, and Arleen C. Anderson, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Grundy County, the defendant, Edward Alphons Moore, Jr., was convicted of seven counts of first degree murder, and one count each of home invasion, residential burglary, aggravated criminal sexual assault, robbery and arson. At a separate sentencing hearing, the jury found the defendant eligible for the death penalty (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)(c)), and found no mitigating circumstances sufficient to preclude the imposition of the death penalty (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(g)). The trial court sentenced the defendant to death. No sentences were imposed on the other felony counts. The defendant's death sentence has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons that follow, we affirm the judgment of the circuit court.

## FACTS

The charges against the defendant stem from the sexual assault and murder of Judy Zeman on July 7, 1991. At trial, Dennis Hackett testified that he reported to the Grundy County sheriff's department an abandoned car in his front yard on July 7, 1991. Deputy Lonnie Harvey testified that he responded to the call at 5:22

a.m. and discovered a Cadillac car against a tree with its keys in the ignition and its engine running. Harvey determined that the car was registered to the Zemans, who lived nearby, and drove to their home. As Harvey neared the Zeman home, he noticed a large woodpile burning and a burn victim lying just east of the attached garage on the horseshoe driveway. The victim was unclothed, had burns over most of her body, had a "circular halo clump of duct tape" stuck in her hair, was lying on her back with her hands tied underneath her by duct tape, and was moaning for help. The victim identified herself as Judy Zeman and told Harvey that a man "raped [her] and lit [her] on fire." She pleaded with Harvey to untie her hands and told him that she was cold. After Harvey cut the duct tape binding her hands and covered her with a blanket, he "asked [the victim] if she knew who had done this to her, and she said no she didn't." Harvey testified that he never asked for a facial description and the victim did not volunteer one.

While awaiting the ambulance, the victim told Harvey that she had been asleep in her bedroom with her dog, who began barking at about 2:30 a.m. After awhile, she opened the bedroom door to let the dog out, and walked to the bathroom when a man jumped out with a knife. The victim related that it was extremely dark and that all she could tell about the man was that he wore black tennis shoes, dark clothes, and gloves. She said that the man raped her in her bedroom, stole money and jewelry, and took her outside to the woodpile, which was located to the southeast of the horseshoe driveway. The man told her that he had to burn some evidence. He then poured gasoline on her and lit her on fire. She later crawled from the woodpile to the driveway. She added that the man kept calling her a bitch. The victim told Harvey that her husband was in Alaska on a fishing trip. When Harvey told the victim that her

car was found, she responded that she thought the man was going to sell the car. A paramedic testified that the victim told her that she had been lying on the driveway since 3 or 3:30 a.m.

The victim was admitted to Morris Hospital's emergency room at 6:16 a.m. on July 7. The physician testified that he believed the victim sustained second- and third-degree burns over 90% of her body and was conscious but in shock. At 6:31 a.m., the victim was intubated, rendering her unable to speak. In fact, the victim was never able to speak again.

In the brief 15 minutes between her hospital admission and intubation, the victim spoke with various medical personnel on duty. Debbie Esler, a cardiopulmonary technician, testified that she asked the victim if she had ever seen the man who did this to her before and that the victim said "no." Patty Orton-Williamson, a nurse, testified that she heard the victim tell Esler either that she did not see the man or that she did not know the man.

Medical personnel also testified to other information. Esler testified that the victim told her that the man tried to tie her to the back of her car and that he beat her. Terry Donahue, an anesthetist, testified that the victim told him that the man started her car and told her to kneel behind the exhaust pipe, but she refused. Donahue and Esler also testified that a strip across the victim's eyes did not appear to be as burned as the rest of her face. Donahue testified that this strip was consistent with the size of the duct tape stuck in the victim's hair. Esler testified that she believed the duct tape stuck in the victim's hair, which, according to other witnesses, gave the appearance of a halo, had once covered the victim's eyes and had later been pushed up.

The victim was transferred from Morris Hospital to another hospital that morning. She remained intubated

and thus unable to speak. The victim was pronounced dead at 8:43 that evening. She died from thermal burns. The medical examiner who performed the autopsy testified that the victim also had a bruise on her vaginal wall consistent with sexual assault, head injuries caused by blunt trauma, and a tongue laceration consistent with being struck on the jaw. The medical examiner further testified that some of the victim's eyelashes, some of her right eyebrow, and a little of her left eyebrow were still intact.

The Grundy County sheriff's department investigated the murder. The sheriff testified that, because the Zeman house was newly built and secluded, he told officers to interview those who had worked on the house, including the defendant. The sheriff testified that the officers could not find the defendant, who, they later learned, had flown to Florida on July 7.

A deputy testified that on July 7 he found a business card in the driveway of the Bruce Barr residence, a new home being built next door to the home where the victim's car had been abandoned. The business card was pink and had printed on it "E & M Painting" and "Ed Moore." A detective testified that Barr told him that he did not see the defendant's business card on the driveway when he left the construction site at 5 p.m. on July 6. Barr testified that the defendant had visited the site several times within weeks of the murder to solicit work, but that he did not give Barr a business card. Pursuant to a search warrant issued on July 15, 1991, a detective seized three of the same business cards from the floorboard of defendant's car and a box of the same from defendant's apartment. A print shop owner identified the box of business cards, and testified that it left his shop on June 26, 1991.

The sheriff's department interviewed Carl Zeman, the victim's husband. Carl testified at trial that he and

his wife moved into the unfinished home in December 1990. Carl stated that the defendant painted the interior of their home from mid-April to June 1991. During this time, the defendant spent time alone in the house and befriended the family dog. Carl testified that he had paid the defendant in cash from a safe located in a master bedroom closet on occasion. He said that he and his wife were the only ones who knew the safe's combination.

Carl left for an Alaska fishing trip on July 2, 1991, and was scheduled to return on July 8, 1991. Carl testified that he had planned this trip months in advance and had mentioned it in the defendant's presence. When Carl left for the trip, the safe contained between $7,000 and $10,000, some of his wife's jewelry, and other legal papers. When he returned, the safe was empty. Also missing were his wife's car and a gasoline can from the garage. According to Carl, defendant never had permission to use his wife's car. He further testified that the defendant had access to a house key that opened every door to the house except the patio door. A crime scene technician testified that the patio door was the point of forcible entry to the home.

During their investigation, the sheriff's department subpoenaed telephone records. An Illinois Bell security manager testified at trial that, at 9:07 p.m. on July 6, a 10-minute telephone call was placed from the defendant's home phone number to the Zemans' home phone number.

Several witnesses testified regarding the defendant's financial status before the time of the murder. An operations officer of a bank testified that the defendant's checking account was closed on April 19, 1991, because of overdrafts. An officer of another bank testified that the defendant's checking account was closed on May 8, 1991, because of overdrafts.

An Illinois state police sergeant testified that he searched the home of the defendant's girlfriend pursuant to a warrant on July 20, 1991, and found two money orders dated July 9, 1991. Each money order was made payable to the girlfriend in the amount of $700. The remitter listed was Ken Moore.

Numerous witnesses testified regarding the defendant's whereabouts on July 6 and 7, 1991. A restaurant owner in Westmont testified that the defendant arrived at his restaurant/bar around 3 p.m. on July 6 and left around dusk. The defendant's apartment building manager testified that she talked with the defendant in her apartment briefly on July 6 between 8 and 9 p.m. As stated, at 9:07 p.m. on July 6, a 10-minute phone call was placed from the defendant's phone number to the Zemans' phone number. Sometime between 10 p.m. and midnight on July 6, defendant left a message on a customer's answering machine, in which he apologized for missing their July 6 appointment and said he would stop by on July 7. The customer never heard from the defendant again. Two witnesses testified that the defendant was at a bar on July 6, and one of the two witnesses testified that the defendant stayed until at least 12:50 a.m. on July 7. A friend of the defendant's next-door neighbor testified that while he was at his friend's apartment briefly at around 1 a.m. on July 7, the defendant came over and asked for a beer.

No testimony established where the defendant was while the victim was being attacked, which, according to testimony, was sometime between 2:30 and 3:30 a.m. on July 7. At 6:30 a.m. on July 7, flight reservations were made by phone for Ken and Cathy Peterson. The flight was to leave Chicago and arrive in Florida on July 7. A sales agent identified the defendant at trial as the person who came to her ticket counter to purchase one of these tickets. Because he was paying in cash, had no

baggage, and was purchasing a one-way ticket, the agent requested identification. Initially the defendant said he had none, but he later confessed that his name was Ed Moore, not Ken Peterson, and displayed his Illinois driver's license. The agent reissued a ticket for the Florida flight in the name of Ed Moore.

At trial, the victim's daughter identified her mother's pearl ring, topaz ring and diamond wedding band from photographs. These photographs were also shown to two Florida witnesses. One witness from Florida testified that the defendant tried to sell her a diamond ring and a pearl ring in a Florida bar on July 9, 1991, and she identified the pearl ring as the victim's from a photograph. A co-worker corroborated the witness' testimony, but a Florida officer testified that the co-worker had stated earlier that he did not see the defendant with jewelry. The co-worker added that the defendant's appearance had changed between July 9 and a week or two later. A second witness testified that the defendant tried to sell her a diamond ring and a topaz ring in a Florida bar on July 20, 1991, and she identified the topaz ring as the victim's from a photograph. The second witness admitted that she saw a poster offering $40,000 for information leading to the defendant's conviction, but testified that she did not expect to receive the reward. She added that the defendant kept calling her a bitch.

Several witnesses testified that the defendant acted suspiciously while in Florida. In July 1991, a Pinellas County detective placed a motel guest registered as Ken Pontello under surveillance. After the investigation was closed, the detective learned that Ken Pontello was the defendant. During surveillance, defendant was interviewed twice. A Florida officer testified that on July 23, he approached the defendant at a pay phone. The officer searched a bag that was sitting at the base of the phone,

and found clothing and $965 in cash. Defendant identified himself as Ken Pontello and displayed an Arizona driver's license, but was unable to correctly state his social security number. The officer also inquired about a bandage on the defendant's right forearm. While the defendant gave medical excuses for it, the officer determined that the bandage covered a tattoo like one on the defendant's right forearm. In the second interview on July 24, defendant identified himself to a detective as Keith Moore, and could not explain why he was registered as Ken Pontello. Defendant stated that he was from Phoenix, but gave a fictitious address. Defendant possessed some clothing and a check in the amount of $1,000 or $2,000.

A cab driver in Florida knew the defendant as Tom. The cab driver testified that on July 23 he booked a room for the defendant under his name because the defendant said he had no identification. He added that the defendant's appearance had changed since several weeks before July 23. The cab driver also admitted that he had heard about a reward.

A friend of the defendant who lives in Florida testified at trial that the defendant called the friend, and told the friend that he needed $5,000 in money orders "laundered" through the friend's mother and some cash to tide him over. In cooperation with a Federal agent, the friend sent the defendant $100 payable to Ken Saif through Western Union on July 27, and learned later that day that the money had been picked up at a bus terminal in New York City. The friend added that the defendant calls anyone a bitch when agitated. A Kankakee police officer testified that the friend's mother received three money orders in a Federal Express envelope.

A New York City detective testified that on July 27, a Grundy County deputy called and told him that a mur-

der suspect wanted in Illinois had just picked up $100 from a Western Union located in his precinct. The defendant was arrested later that day by New York City officers. When arrested, defendant had in his hand a cut up identification card in the name of Ken Saif. Defendant was taken to a New York City police station and placed in a holding cell.

Testimony was introduced at trial regarding inculpatory statements made by the defendant while in the holding cell with Irwin Johnson and Troy Snell. Johnson testified that defendant told him and Snell that he was being held in connection with an Illinois murder. Defendant explained that he was a painter for a wealthy woman with whom he was having an affair. Defendant stated that he and the woman had sex and then argued about her husband coming home. Defendant said that he used duct tape to cover the woman's eyes and to tie her wrists behind her. He stated that he took some of the woman's money and jewelry, and then set her on fire. Johnson admitted that he heard Snell talk about a $40,000 reward for information leading to defendant's conviction when he and Snell were being transported to testify in this case. Snell testified in rebuttal that Johnson was present when Snell heard the defendant say that the police were trying to charge him with murder, rape and robbery in Illinois, but that they had nothing on him. A New York City detective testified that while he was doing paperwork, he overheard the defendant say that "they couldn't have gotten the prints off the tape it should have burned" and "something like she couldn't have told them who it was." The detective also testified that defendant's hair looked like it had been dyed.

Physical evidence was admitted at trial. A forensic scientist testified that two fingerprints on the adhesive side of the duct tape removed from the victim's hair and

one fingerprint on a key tag found in the victim's abandoned car were identified as defendant's. Another forensic scientist testified that seminal material taken from the victim's vaginal swab was consistent with defendant's blood type. Having compared hairs found on the floor mat of defendant's car to known standards, a forensic scientist testified that two hairs were consistent with the victim's head hairs, and that one hair was consistent with the defendant's head hairs and showed signs of extreme heat damage. He also compared hairs found on the victim's bedding and underclothing, and testified that those hairs were not consistent with defendant's. The State's DNA expert testified that defendant's blood and the seminal fluid taken from the victim's vaginal swab "matched," and that the probability that someone other than defendant was the donor was 1 in 466. Defendant's DNA expert testified that the FBI procedures were flawed and that the probability calculated was not significant.

Defendant did not testify at trial. The jury found the defendant guilty of seven counts of first degree murder, and one count each of home invasion, residential burglary, aggravated criminal sexual assault, robbery and arson. The State asked for the death penalty. In the first stage of the sentencing hearing, the jury found the defendant eligible for the death penalty because he was over 18 years of age at the time of the murder and was convicted of killing the victim in the course of five of the felonies listed in section 9—1(b)(6)(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)(c)).

During the second stage of the sentencing hearing, the State presented evidence in aggravation, including the following. A probation officer testified that the defendant had an extensive criminal history, including imprisonment for committing forgery, theft, residential

burglary, deceptive practices, and violations of proba-
tion and parole. Defendant also received a ticket at a
correctional center in 1990 for threatening to "shank"
an inmate. Defendant's father, Edward Massaro, testi-
fied that he changed his name from Moore to Massaro
because the defendant had stolen and cashed his govern-
ment checks. Massaro added that he no longer talked to
his son "because of all the things that he has done to
[Massaro]." Two Westmont police officers testified to an
incident in 1981 in which the defendant abducted his
own baby and harassed the baby's mother and threat-
ened to kill the baby. A Hinsdale detective testified to
an incident in 1976 in which the defendant allegedly
forced a 15-year-old girl into a car, threatened to rape
her, and struck her before she was able to escape. A
State Police officer testified to a similar incident in 1989
in which the defendant allegedly raped a 15-year-old
girl. A Hinsdale detective testified that he investigated
an incident in 1983 in which the defendant stole items
from an employer's home and then fled to Florida. He
was later extradited and convicted of residential bur-
glary. A Wheaton officer testified to a similar incident
in 1989 in which the defendant stole money and jewelry
from an employer's home. A friend of the defendant
testified that the defendant told her in May 1991 that
he was painting for wealthy people who owned a Cadil-
lac and that he "ought to rob the bitch." A deputy testi-
fied that the defendant attacked two correctional offic-
ers and threatened to kill another, and that the
defendant told an escort deputy that he ought to grab
the escort deputy's gun and run.

In mitigation, the defense adduced testimony regard-
ing the defendant's history of child abuse. The defen-
dant's uncle testified that he witnessed many beatings
administered to the defendant by his father, and
recounted incidents including a bloody beating in a crib

when the defendant was $2^1/2$ months old. Four of the defendant's siblings testified. Katherine and Cynthia testified that their father beat the defendant, and recalled that their father had stabbed the defendant when he was 23 years old. Cynthia testified that she stopped seeing the defendant, however, because he stole from her. Kevin described their father's beatings of the defendant as too numerous to count. Kenneth numbered the beatings in the "hundreds" or "thousands." Kenneth testified, however, that he no longer allowed the defendant in his home because he caught a prostitute, whom the defendant brought to Kenneth's home, putting a needle in her arm while Kenneth's children were home. Kenneth further testified that several of the defendant's siblings did not want the defendant around their children for fear that he would molest them. We note that the defendant's father denied the abuse and that the defendant's father testified that the defendant was placed in special education classes from second through eighth grade, did not complete high school, and had been diagnosed as suffering from a mental disability.

At the conclusion of the second stage of the sentencing hearing, the jury found no mitigating circumstances sufficient to preclude the imposition of the death penalty. The defendant was sentenced to death for the murder of Judy Zeman. His post-trial and supplemental post-trial motions were later denied.

## DISCUSSION

### I. Sufficiency of Evidence

The defendant first contends that he was not proved guilty beyond a reasonable doubt. On review, this court will not reverse a conviction unless the evidence is so improbable that a reasonable doubt of the defendant's guilt is justified. (*People v. Eyler* (1989), 133 Ill. 2d 173,

191.) " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.)" (*Eyler,* 133 Ill. 2d at 191, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) The standard is the same whether the evidence is direct or circumstantial. *People v. Sutherland* (1992), 155 Ill. 2d 1, 17.

In this case, the jurors heard testimony against the defendant showing evidence of opportunity, motive, flight, and inculpatory statements. Also admitted was testimony that the defendant was in possession of the victim's jewelry in Florida, that the defendant had large amounts of money, and that he had changed his appearance. Forensic evidence was also presented. Defendant, however, argues numerous infirmities with the evidence against him. While we have considered all of his arguments, we only mention the following.

Defendant first asserts that testimony established that the victim was unable to identify her attacker. He argues that, because she knew him, she would have identified him if he were the attacker. Testimony, however, also showed that it was dark at the time of the attack and that the victim's eyes were covered by duct tape. Furthermore, a detective overheard the defendant say "something like she couldn't have told them who it was."

Defendant next contends that his fingerprints could have been expected to be found on the duct tape and the key tag because he was a painter and may have had reason to move the victim's car. The defendant's fingerprints, however, were found on the adhesive side of the duct tape, which suggests that they were left when the duct tape was used. In addition, the victim's husband testified that the defendant never had permission to drive his wife's car.

Defendant also tries to discredit the credibility of the two ring witnesses. Defendant points out that one witness identified the diamond ring only after seeing it for the first time in the prosecutor's office. The identification of one of two rings at trial, however, was highly incriminating. Defendant further asserts that the second witness was aware of a $40,000 reward for information leading to his conviction. Mere knowledge of a reward, however, does not render testimony incredible.

Defendant next tries to discredit cellmate Johnson's testimony. Defendant argues that Johnson's testimony is not credible because Johnson is a felon. Further, defendant argues that Snell, who is also a felon, testified that he only heard the defendant say that police were trying to get him for murder in Illinois but that the police had nothing on him. We will not reweigh the credibility of these witnesses.

After reviewing the evidence in a light most favorable to the prosecution, we conclude that there was more than sufficient evidence to convict the defendant of murder beyond a reasonable doubt.

## II. The Admission of DNA Evidence

Defendant next argues that the trial court erred in admitting deoxyribonucleic acid (DNA) evidence. He first contends that the trial court erred in denying a *Frye* hearing. Second, defendant argues that the trial court erred in admitting the DNA evidence when its prejudice outweighed its probative value.

Before trial, defense counsel moved to exclude the results of the DNA testing in this case. (*Frye v. United States* (D.C. Cir. 1923), 293 F. 1013.) In *Frye*, the court held that the use of evidence that has not gained general acceptance within the relevant scientific community is improper. (*Frye*, 293 F. at 1014; but see *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 588, 125 L. Ed. 2d 469, 480, 113 S. Ct. 2786, 2794

(*Frye* test no longer applicable in Federal trials).) This court recognized the *Frye* standard in *People v. Baynes* (1981), 88 Ill. 2d 225, 241 (polygraph evidence). The defendant contended that a *Frye* hearing, in which the trial judge would determine outside of the jury's presence whether DNA evidence is generally accepted within the scientific community, was necessary here. The trial court refused to grant a *Frye* hearing. See *People v. Lipscomb* (1991), 215 Ill. App. 3d 413, 429-32; *People v. Miles* (1991), 217 Ill. App. 3d 393, 402-04.

During trial, the defendant renewed his objection to the admission of the DNA evidence. The defendant raised the issue of whether the DNA evidence was probative when the probability of a random match was 1 in 466, relying on *People v. Harbold* (1984), 124 Ill. App. 3d 363, 383 (admission of probability statistic of 1 in 500 as relating to genetic marker testing was plain error). The trial court held an evidentiary hearing outside of the jury's presence. The State called as an expert witness Robert Coffin, a special agent with the FBI, who testified to the propriety of the FBI procedures. The defendant did not call an expert witness to challenge Coffin's testimony nor did he make an offer of proof. After considering Coffin's testimony, arguments of counsel, and relevant case law, the trial judge ruled that any questions as to the reliability of DNA testing in this case went to the weight of the evidence rather than its admissibility, and admitted the DNA evidence. To the extent that *Harbold* was contrary to its ruling, the court declined to follow it.

The State then presented the DNA evidence to the jury. Coffin testified to a "match" between the defendant's blood and the seminal fluid from the victim's vaginal swab. Coffin further testified that the probability of a random match was 1 in 466. In response, defense counsel called as an expert witness Pravatchai Boonlay-

angoor, a medical laboratory scientist, who contested the results of the DNA testing and the significance of the probability calculated. Before this court, defendant again argues that the trial court erred in admitting the DNA evidence.

We first examine the *Frye* hearing issue. While we believe the defendant raises an interesting issue as to whether the FBI's probability calculation method is generally accepted in the scientific community, we need not decide that question here. Initially, we note that the trial court did hold an evidentiary hearing before DNA evidence was presented to the jury. At that hearing, defendant did not present an expert witness to challenge the State's expert witness or make an offer of proof. As a result, defendant arguably waived his claim. Moreover, we believe that any error the trial judge may have made in denying a formal *Frye* hearing was harmless. "When the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result, the conviction may be affirmed." (*People v. Arman* (1989), 131 Ill. 2d 115, 124 (mug shot evidence).) The evidence of the defendant's guilt in this case was overwhelming without considering the DNA evidence.

We similarly believe that any error in admitting DNA evidence when the probability of a random match was 1 in 466 was harmless. We thus need not address the defendant's other argument that DNA evidence should not have been admitted because its prejudicial effect outweighed its probative value.

### III. Denial of a Fair Trial

Defendant next argues that he was denied a fair trial and due process by certain prosecutorial comments and that his convictions should therefore be reversed.

He challenges comments relating to forensic evidence, to the presumption of innocence, and to his failure to testify.

## A. Comments Relating to Forensic Evidence

Defendant contends that the prosecution erred in arguing to the jury that certain forensic evidence conclusively linked him to the crimes charged. Specifically, defendant objects to the prosecutorial comments that a "burnt hair" came from the defendant's head, that an ABO blood type "match" existed, that DNA testing revealed a "match" between defendant and the rapist, and that the "killer's semen" in the victim's body "matched" the defendant. Defendant also argues that the prosecutor erred in arguing facts not in evidence when he said that the burnt hair was in the victim's car.

We first point out that the defendant failed to object to these challenged remarks at trial, and he has thus waived the issues for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Plain errors affecting substantial rights, however, may be considered by a reviewing court even if a defendant fails to properly preserve the issue. (134 Ill. 2d R. 615(a).) The plain error rule applies when the evidence is closely balanced or when the error is of such magnitude that it deprives the defendant of a fair trial. (*People v. Fields* (1990), 135 Ill. 2d 18, 60; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) As stated, we do not find the evidence in this case closely balanced, and thus examine the remarks only to determine whether any error deprived the defendant of a fair trial.

Defendant first argues that the prosecutor in rebuttal overstated the evidence when he said, "Judy Zeman didn't know that that burnt hair was in her car that came off his [defendant's] head." Defendant points out that a forensic scientist testified only that the burnt hair was consistent with his hair, not that the burnt

hair was conclusively defendant's. Defendant concludes that the burnt hair comment amounted to plain error. *People v. Linscott* (1991), 142 Ill. 2d 22.

The *Linscott* court reversed a murder conviction based on improper prosecutorial comments that misrepresented two of three elements of the State's evidence against the defendant. In *Linscott*, the prosecutor in closing argument commented that the defendant's hair had been found at the crime scene. The *Linscott* court found that the prosecutor's comment was improper because the evidence merely showed that the defendant was in a class of possible donors of the hair and not that the hair conclusively belonged to the defendant. (*Linscott*, 142 Ill. 2d at 28-34.) Because the evidence in *Linscott* was so closely balanced, this court concluded that the improper comment amounted to plain error. *Linscott*, 142 Ill. 2d at 33-34.

As in *Linscott*, we find that the prosecutor's comment that the burnt hair in the car came from the defendant's head overstated the evidence. Unlike the evidence in *Linscott*, however, the evidence against the defendant in this case was not closely balanced. We further do not believe that the burnt hair comment deprived the defendant of a fair trial. (See *People v. Robinson* (1993), 157 Ill. 2d 68, 83-84 (prosecutor's overstatement of blood-comparison and boot-impression evidence did not amount to plain error); *Sutherland*, 155 Ill. 2d at 22-25 (prosecutor's overstatement of fiber-comparison evidence did not amount to plain error).) The prosecution only remarked once that the burnt hair was from the defendant's head. The other reference made by the prosecution was that "[a] single burnt hair [was] in his [defendant's] car," which was a statement supported by testimony. We also note that the jury was instructed to disregard statements made in closing argument not based on the evidence.

Defendant also asserts that the prosecutor argued facts not in evidence when he stated that the burnt hair was found in the victim's car, for the testimony showed that it was found in defendant's car. We agree with the State that this misstatement was merely a slip of the tongue. The trial judge instructed the jury to disregard any statements made in closing argument that were not based on the evidence. We find that the misstatement did not constitute plain error.

We next consider the ABO blood type comment. At trial, Arlene Hall, a forensic scientist, testified that the defendant has type A blood and is considered a secretor. She explained that a secretor is a person whose ABO blood type can be detected in his or her bodily fluid secretions. Hall concluded that the blood type of the person whose seminal material was obtained from the victim's vaginal swab is consistent with the defendant's. Defense counsel elicited from Hall that 40% of the Caucasian population in the United States has type A blood and that between 70% and 75% of that 40% are secretors.

Defendant takes exception with the prosecutor's comment in closing argument that the forensic scientist declared an ABO blood type "match." He again cites *Linscott* in support of his argument that the comment amounted to plain error. In *Linscott*, the prosecutor told the jury that hairs found at the victim's apartment "matched" the defendant's. The *Linscott* court found that the prosecutor's "match" comment misrepresented the inherent nature of hair comparison and overstated the evidence because testimony established only that the hairs were consistent with the defendant's. (*Linscott*, 142 Ill. 2d at 34-35.) We note that the *Linscott* court concluded that the improper comment did not amount to plain error. *Linscott*, 142 Ill. 2d at 35.

As in *Linscott*, testimony here established only that

defendant's blood type was consistent with the blood type found in the seminal material, not that it "matched." We believe, however, that the *Linscott* discussion as to "match" comments is distinguishable from the claim here because hair comparison is different from ABO blood type grouping. While hairs may vary from hair to hair on an individual's head, each individual has an identifiable ABO blood type. The ABO system is widely recognized because accurate typing is crucial to the administration of safe blood transfusions. (*Harbold*, 124 Ill. App. 3d at 379.) We conclude that the prosecutor's comment as to an ABO blood type "match" was not improper.

Defendant next contends that the prosecutor erred in arguing to the jury that the DNA testing revealed a "match" between the defendant and the rapist. Specifically, the defendant objects to the following prosecutorial comments:

> "He confessed. He left his semen in the body of his victim. *** You heard Agent Coffin of the FBI. DNA, match. Even the defendant's own expert witness could not exclude this man. Now, these experts can play with the numbers all they want. One in 466 or one in 48, they can say whatever they want but one fact stands out. This man cannot be excluded. The semen of the rapist matches the defendant. Uncontradicted. Uncontroverted. The semen matches."

Again, defendant relies on the *Linscott* discussion of "match" comments to support his argument that the remarks constituted plain error.

We believe that the DNA "match" comments were supported by the evidence at trial. The State's expert testified to a "match" between defendant's blood and the seminal fluid from the victim's vaginal swab. Both experts explained at trial that DNA testing is a comparison science and that a "match" is expressed in probabilities, not absolutes. Furthermore, the prosecutor's comments, considered in context, simply stressed that a

"match" means that the defendant could not be excluded as the donor of the semen, not that the defendant was the only possible donor of the semen. Even if the admission of DNA evidence in this case was erroneous, thus making the "match" comments improper, however, we do not believe that the comments were so egregious as to deprive the defendant of a fair trial. In addition, the evidence of the defendant's guilt was overwhelming.

Finally, defendant argues that the prosecutor erred in remarking in opening that the "killer's semen" in the victim's body "matched" defendant's. Whether the prosecutor was referring to a DNA "match" or an ABO blood type "match," we believe that the comment was not improper or did not deprive the defendant of a fair trial for the reasons stated above, and, thus, do not invoke the plain error rule.

B. *Comments Relating to the Presumption of Innocence*

Defendant argues that certain prosecutorial comments denigrated the presumption of innocence and deprived him of a fair trial and due process. Defendant, however, failed to object to these comments at trial, and he thus waived the issues. (*Enoch*, 122 Ill. 2d at 186.) Defendant claims that the errors were plain errors and that we should review the errors as such.

Defendant first objects to comments in closing argument in which the prosecutor stated that the jury may wonder, in light of all of the evidence, "[W]hy we are even here?" The prosecutor further stated:

"Why in the fact [*sic*] of all the evidence that you've heard are we even here? But the answer is simple. No matter how obvious the guilt, no matter how powerful the evidence, every defendant is entitled to his day in court."

In rebuttal, the prosecutor also stated that "[e]ven when the evidence is so compelling, we have to have a trial."

Defendant argues that these comments denigrated the presumption of innocence. We do not agree. Consid-

ered in context, we find that the prosecutor's remarks were merely emphasizing to the jury the overwhelming nature of the evidence and thus were not improper.

Defendant next objects to the following comment:

"[Defense counsel] would have you believe there's an impossible burden to be met, but the burden here is the same burden as in every courtroom in this building and every courtroom in Will County, going on everywhere in the United States from 1776 to date, and it's met every single day."

Defendant contends that this comment minimized the State's burden of proving guilt beyond a reasonable doubt by reducing that burden to a *pro forma* detail. See *People v. Starks* (1983), 116 Ill. App. 3d 384, 395 (prosecutor went beyond boundary of propriety when he asserted that burden was same in "any type of case" and that "we don't have a burden"); *People v. Frazier* (1982), 107 Ill. App. 3d 1096, 1102 (court stated in *dicta* that prosecutor's comment on reasonable doubt standard was improper).

We do not agree. In *People v. Bryant* (1983), 94 Ill. 2d 514, 523, this court held that a prosecutor's comments that the State's burden is "not unreasonable" and "met each and every day in courts" did not reduce the State's burden of proof. Nearly identical comments to the ones made in this case were also made by the prosecution in *People v. Phillips* (1989), 127 Ill. 2d 499, 528, and *People v. Gacho* (1988), 122 Ill. 2d 221, 255, and were held not to have reduced the State's burden. Unlike *Starks*, where the prosecutor asserted that the State had no burden, we believe that the comments here fell within the bounds of proper argument.

Defendant further contends that the prosecutor's reference to a "guilt trip" in rebuttal violated his State and Federal constitutional right to due process of law. (See *Donnelly v. De Christoforo* (1974), 416 U.S. 637, 40 L. Ed. 2d 431, 94 S. Ct. 1868.) In rebuttal, the prosecutor

stated in his first sentence, "The decision you will carry with you for the rest of your life. Guilt trip on you." Considered in context, we believe that the "guilt trip" remark was an invited response to defense counsel's comment in closing argument that "[i]t [the verdict] is a decision you will live with for the rest of your life." As a result, defendant cannot now claim prejudicial error. *People v. Nevitt* (1990), 135 Ill. 2d 423, 454.

### C. *Comments Relating to the Defendant's Failure to Testify*

Defendant next contends that the prosecutor improperly commented on his failure to testify at trial and thus deprived him of a fair trial and due process. See *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (accused has constitutional right not to testify as a witness in his own behalf); *People v. Wollenberg* (1967), 37 Ill. 2d 480 (comment by prosecutor whose underlying purpose and ultimate effect was to call attention to defendant's silence amounted to plain error).

In closing argument, the prosecutor told the jury that certain evidence presented at trial was "uncontradicted" and "uncontroverted." First, the prosecutor stated as follows:

> "He told [cellmate] Irwin that he taped Judy's eyes and wrists. That he stole her money and jewelry. And that he set her on fire. He confessed. Irwin Johnson didn't know anything about this case. He didn't know about tape or fire or jewelry. This man knew about that. Uncontradicted, uncontroverted. He confessed."

Defense counsel objected to this remark and asked for a limiting instruction. The trial judge sustained the objection and told the jury that "the defendant in this case is presumed innocent. The State must prove the defendant guilty beyond a reasonable doubt. The defendant does not have to produce evidence to prove his innocence." The act of sustaining an objection and properly admon-

ishing the jury is usually viewed as sufficient to cure any prejudice. *People v. Gonzalez* (1991), 142 Ill. 2d 481, 491; *People v. Baptist* (1979), 76 Ill. 2d 19, 30.

The prosecutor continued closing argument and made similar "uncontradicted" and "uncontroverted" comments as to the DNA evidence, the fingerprint evidence, the flight evidence, the ABO blood type evidence, and the burnt hair evidence. Defense counsel failed to object to these additional comments at trial, and has thus waived the issues. (*Enoch*, 122 Ill. 2d at 186.) Defendant claims, however, that the comments amounted to plain error, and that we should review the errors under that rule.

Defendant argues that the prosecutor's comments were direct references to his failure to testify. The State responds that the prosecutor's comments were proper because they were not intended to direct the jury's attention to defendant's silence. (*People v. Herrett* (1990), 137 Ill. 2d 195, 211 (prosecution may describe evidence as uncontradicted even if defendant is only one who could contradict it when remarks are not intended to direct jury's attention to defendant's silence); also see *People v. Morgan* (1986), 112 Ill. 2d 111, 133-34.) The *Herrett* court held that the question on review is whether the comments, considered in the context of the entire proceeding, were improper. *Herrett*, 137 Ill. 2d at 211.

In the instant case, we agree with the State that the prosecutor's remarks were not intended or calculated to direct the jury's attention to the defendant's failure to testify. We believe that the prosecution was simply emphasizing the character and the weight of the evidence against the defendant. Even if error occurred, however, the "uncontradicted" comments did not deprive the defendant of a fair trial. After the first comment, the trial judge admonished the jury that "[t]he

defendant does not have to produce evidence to prove his innocence." The trial judge also later instructed the jury that the defendant's silence should not be considered by the jury in any way in arriving at a verdict. Given the context of the entire proceeding, we find that the comments were not improper or did not deprive the defendant of a fair trial. We therefore do not invoke the plain error rule.

IV. Effective Assistance of Counsel

Defendant next argues that he was denied effective assistance of counsel by trial counsel's failure to file a motion to suppress hair evidence that was recovered from the floor mat of the defendant's car.

Grundy County Deputy Joseph Elens and Illinois State Police Sergeant Ken Kaupas testified at trial that they searched the defendant's car pursuant to a warrant on July 15, 1991. Elens testified that he took the floor mat from the passenger side of the front seat, placed clear tape over the carpeted section, and delivered it to a crime lab for analysis. The inventory list of articles seized during the car search included "1 MAROON FLOOR MAT WITH HAIR ON IT." Ralph Meyer, a forensic scientist, testified that he removed 30 hairs from the defendant's car mat and compared them microscopically with known standards. Meyer's findings included two Caucasian head hairs consistent with the victim's hair, and one Caucasian head hair "showing extreme heat damage" consistent with the defendant's hair.

On the merits of his suppression claim, defendant asserts that the search warrant did not list as items to be seized the floor mat or hairs, and contends that the warrant was a "general" warrant that provided officers with unfettered discretion. The defendant concludes that the seizure was barred by the fourth and fourteenth amendments. See *Andresen v. Maryland* (1976), 427 U.S.

463, 478-80, 49 L. Ed. 2d 627, 641-42, 96 S. Ct. 2737, 2747-48; *Stanford v. Texas* (1965), 379 U.S. 476, 486, 13 L. Ed. 2d 431, 437-38, 85 S. Ct. 506, 512.

In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the United States Supreme Court established a two-pronged test for considering ineffective-assistance claims. (See *People v. Albanese* (1984), 104 Ill. 2d 504 (court adopted *Strickland* test).) To succeed on an ineffective-assistance claim, a defendant must establish that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; see also *Kimmelman v. Morrison* (1986), 477 U.S. 365, 375, 91 L. Ed. 2d 305, 319, 106 S. Ct. 2574, 2583 (when ineffective-assistance claim is based on failure to litigate fourth amendment claim, defendant must also show fourth amendment claim is meritorious).

In the instant case, we find that the defendant has failed to satisfy the prejudice prong of the *Strickland* test. The evidence against the defendant in this case was overwhelming. We therefore believe that, even if the evidence had been suppressed, the outcome of the defendant's trial would not have changed.

V. Denial of a Fair Capital Sentencing Hearing

Defendant contends that he was denied a fair capital sentencing hearing because the trial court denied his request to argue jury nullification, the State introduced hearsay evidence, and the prosecution made improper arguments to the jury.

A. *Jury Nullification*

At the eligibility stage of the sentencing hearing, defense counsel requested permission to argue to the jury the theory of jury nullification. Defense counsel stated to the trial judge that he would like "to suggest

to this jury that they can stop at this point *** and not impose the death penalty based upon their ability as jurors to find this statute [the Illinois death penalty statute] unconstitutional." The trial judge denied defense counsel's request to argue jury nullification.

Defendant argues before this court that it was reversible error for the trial court to deny defense counsel the opportunity to argue jury nullification. The defendant concedes that a criminal defendant has no right to instruct the jury that it may nullify a verdict of guilt. He asserts, however, that a jury has the power to engage in nullification and a defendant has a right to argue nullification to the jury. The defendant relies on language in *United States v. Anderson* (7th Cir. 1983), 716 F.2d 446, and *People v. Ganus* (1992), 148 Ill. 2d 466.

In *United States v. Anderson* (7th Cir. 1983), 716 F.2d 446, 449-50, the court stated that the "necessary historical tension" between jury nullification and a jury's adherence to instructions should not be collapsed by explicit nullification instructions. The *Anderson* court added that " '[t]he jury system provides flexibility for the interests of justice outside the formal rules of law. This embraces whatever extra the defendant conveys by personal representation, whether through demeanor or sincerity of justification.' " (*Anderson*, 716 F.2d at 450, quoting *United States v. Dougherty* (D.C. Cir. 1972), 473 F.2d 1113, 1137.) The defendant argues that the *Anderson* court thus clearly set forth an accused's right to argue jury nullification.

Similarly, defendant cites *People v. Ganus* (1992), 148 Ill. 2d 466, 473, in support of his argument that a defendant has a right to argue jury nullification. In *Ganus*, the defendant argued that he was denied effective assistance of counsel when trial counsel elicited prejudicial testimony about defendant's gang activity to try to prove a compulsion defense which was not a defense

available to the defendant. In finding that the defendant failed to prove his claim under *Strickland*, this court stated in part, "His counsel conceived a compulsion defense which, though not a legal defense, could or might have persuaded a jury not to convict. Jury nullification is always a possibility." (*Ganus*, 148 Ill. 2d at 473-74.) The defendant argues that this court recognized a right to request jury nullification by stating that it is always a possibility.

Neither *Anderson* nor *Ganus*, however, holds that a defendant has a right to argue jury nullification. Both cases simply discuss a jury's power to acquit a defendant on the basis of extraneous factors. We believe that this power does not translate into a defendant's right to argue nullification. (See *United States v. Kerley* (7th Cir. 1988), 838 F.2d 932, 938 ("[J]ury nullification is just a power, not also a right").) Other courts that have considered the issue raised here have similarly held that an accused in a criminal case is not entitled to argue or instruct a jury on nullification. (See, *e.g.*, *United States v. Brown* (7th Cir. 1977), 548 F.2d 204, 210; *United States v. Berrigan* (4th Cir. 1969), 417 F.2d 1002, 1006; *United States v. Sloan* (N.D. Ind. 1989), 704 F. Supp. 880, 884; *Annas v. State* (Alaska App. 1986), 726 P.2d 552, 560 n.8; *Reale v. United States* (D.C. 1990), 573 A.2d 13, 15; *Davis v. State* (Miss. 1988), 520 So. 2d 493, 494-95 (and cases collected); *State v. Pease* (Mont. 1987), 740 P.2d 659, 663; *State v. Bjerkaas* (1991), 163 Wis. 2d 949, 960-61, 472 N.W.2d 615, 619-20.) A defendant does not have the right to have the jury ignore the law or the undisputed evidence in a case. (See *People v. Rollins* (1982), 108 Ill. App. 3d 480, 487 ("defendant has no right to have the jury defy the law or ignore the undisputed evidence").) In the instant case, we conclude that the trial court did not abuse its discretion in denying defense counsel's request to argue jury nullification.

In support of his contention, defendant cites two additional cases. (*People v. Waisvisz* (1991), 221 Ill. App. 3d 667, 675; *People v. Austin* (1982), 111 Ill. App. 3d 213, 215.) In neither case, however, was the propriety of the jury nullification argument at issue on appeal.

## B. *Hearsay Evidence in Aggravation*

Defendant further argues that the trial court erred in allowing the prosecutor to introduce in aggravation double hearsay evidence and, separately, hearsay evidence relating to an alleged rape and attempted rape.

### (1)

Defendant argues that he was denied his right under the eighth amendment and State law to a fair and reliable capital sentencing hearing because the State introduced double hearsay in aggravation. Specifically, the defendant objects to admission of testimony that the defendant attacked two correctional officers, threatened another, and threatened to take a gun and run. The defendant, however, failed to object to the alleged errors at the sentencing hearing, and he has thus waived the issues for review. (*Enoch*, 122 Ill. 2d at 188-90.) Nevertheless, defendant urges this court to apply the plain error rule, which may be invoked if evidence at a sentencing hearing was closely balanced or if the error was so egregious as to deprive the defendant of a fair sentencing hearing. *People v. Fields* (1990), 135 Ill. 2d 18, 60; *People v. Young* (1989), 128 Ill. 2d 1, 57; 134 Ill. 2d R. 615(a).

At a capital sentencing hearing, a trial court, in its discretion, has wide latitude in admitting relevant and reliable evidence in aggravation and mitigation. (*People v. Tenner* (1993), 157 Ill. 2d 341, 380-81.) Evidence in the nature of hearsay may be introduced at sentencing if it is otherwise reliable. (*Tenner*, 157 Ill. 2d at 380-81.) This court has noted, however, that when double hearsay

testimony has been found to be admissible, at least some parts of that testimony have been corroborated. *People v. Erickson* (1987), 117 Ill. 2d 271, 300; *People v. Foster* (1987), 119 Ill. 2d 69, 98.

Defendant objects to the testimony of Grundy County Chief Deputy Terry Marketti. In the first instance, Marketti testified that at least one New York correctional officer told him that the defendant had attacked two New York correctional officers. The defendant argues that the testimony was prejudicial because the prosecutor used it in closing argument as a reason for the jury to impose the death penalty and was unreliable because Marketti could not identify how the defendant allegedly assaulted the officers. Marketti next testified that a Grundy County inmate told him that the defendant said he would kill a correctional officer for shutting off the phone. The defendant argues that this testimony was prejudicial because it was elicited to show future dangerousness. He also contends that the prosecutor in closing argument referred to the phone incident by arguing that the defendant "lives to threaten and to hurt." Last, Marketti testified that an escort deputy told him that while the escort deputy was placing a firearm in a lock-up when entering the courthouse, the defendant said to the escort deputy that he ought to grab the gun and run. The escort deputy did not testify. The defendant concludes that Marketti's testimony was improper double hearsay and that, as a result, his death sentence should be vacated and a new sentencing hearing should be held. We disagree.

The information to which Marketti testified was compiled for security precautions so that those guarding the defendant would, as Marketti testified, "[b]e on their guard for him, if this is what he does to correctional officers." Given the underlying reason for compiling the information, we believe that the testimony was suf-

ficiently reliable. That Marketti was unable to identify the source of information about the alleged attacks or to specify how the officers were attacked does not, as the defendant argues, render the testimony unreliable, but rather goes to the weight to be given the evidence. We reject defendant's argument that admission of the challenged testimony was error.

(2)

Defendant further argues that the trial court erred in allowing the prosecutor to introduce hearsay evidence relating to an alleged rape and attempted rape by the defendant.

At the sentencing hearing, Hinsdale Police Officer James Eccardt testified that he investigated a complaint against the defendant based on an incident in 1976 in which the defendant allegedly forced a 15-year-old girl into a car, demanded sex, and struck her before she was able to escape. Eccardt testified that the victim reported the incident to police immediately after her escape. Defendant was charged with unlawful restraint, battery, contributing to the sexual delinquency of a child, and contributing to the delinquency of a minor, and was convicted of battery.

Illinois State Police Officer Kevin Shaughnessy testified at the sentencing hearing that he investigated an incident in 1989 in which the defendant allegedly forced a 15-year-old girl to have sexual intercourse with him before she was able to escape. Shaughnessy testified that the girl reported the incident to police immediately after her escape, and was taken to a hospital for treatment. He testified, however, that the results of the sexual assault kit were not disclosed because the girl decided that she did not want to go through the ordeal of a trial. The defendant was not prosecuted.

Defense counsel did not make proper objections to the admission of these officers' testimony at the sentenc-

ing hearing. No objection was made to Shaughnessy's testimony. Defense counsel objected to Eccardt's testimony, but based the objection on remoteness rather than hearsay. A specific objection to the admission of evidence waives all grounds not specified. (*People v. Lewis* (1995), 165 Ill. 2d 305, 335; *People v. Curry* (1973), 56 Ill. 2d 162, 170.) Defendant urges this court to reach the merits of this claim under the plain error rule.

Defendant cites *People v. Edwards* (1991), 144 Ill. 2d 108, in support of his contention that the evidence of the alleged rape and attempted rape incidents was unreliable. In *Edwards*, this court held that the trial court did not abuse its discretion in denying the admission of videotaped statements made by the defendant's two children, aged 8 and 11, in mitigation at his capital sentencing hearing. (*Edwards*, 144 Ill. 2d at 174.) In finding that the evidence was unreliable, this court noted that neither child had sworn an oath promising to tell the truth, that the State had no opportunity to cross-examine the witnesses or view the unedited versions, and that the children were young. (*Edwards*, 144 Ill. 2d at 175.) These concerns were aggravated by the fact that the State was unable to establish what the children had been told about their father before being interviewed. *Edwards*, 144 Ill. 2d at 175.

Defendant argues that, as in *Edwards*, the testimony here stems from minors and that such testimony is unreliable. He contends that the testimony here is even more unreliable than in *Edwards* because here the officers relied on the characterizations of others while in *Edwards* the children would have been seen and would have given their own account. Defendant adds that neither complaining witness was available for cross-examination, that he was only convicted of battery for the 1976 incident, and that he was not prosecuted for the 1989 incident. Defendant concludes that the testimony substantially prejudiced him.

We believe that the instant case is distinguishable from *Edwards.* In *Edwards,* the defendant sought to introduce edited versions of videotaped interviews with his young children. The State would have been unable to explore the circumstances surrounding the interviews or to establish what the children had been told about their father's circumstances. In contrast, here, we believe that the testimony was sufficiently reliable. Both officers had personally investigated the incidents and had interviewed the complaining witnesses. (See *People v. Tenner* (1993), 157 Ill. 2d 341, 381 (in determining if a trial court abused its discretion in introducing testimony of officers, court considered whether they had interviewed complaining witnesses).) Both police reports were based on information compiled before the offenses charged here. (See *People v. Morgan* (1986), 112 Ill. 2d 111, 144.) The two complaining witnesses reported the incidents immediately after their escape. One incident was corroborated by a certified copy of a battery conviction. We also note that both investigating officers were subjected to full cross-examination by defense counsel at trial. We find that the trial court did not abuse its discretion in admitting testimony concerning these incidents.

C. *Improper Arguments by Prosecutor at Second Stage of Capital Sentencing Hearing*

Defendant contends that the prosecutor in closing argument at the second stage of the sentencing hearing made repeated emotional appeals to impose the death penalty that were calculated to inflame the emotions of the jury and to diminish the jury's responsibility to make a life or death decision. Defendant maintains that he is entitled to a new sentencing hearing.

(1)

The prosecutor argued to the jury that "[c]apital

punishment is society's only form of self defense against the Ed Moores of this world." Defense counsel objected to this comment, stating, "It's not supported by the evidence, not supported by the argument. The court is going to instruct the jury as to the law ***." The trial judge then stated that he would "instruct the jury as to the law." The prosecutor also stated to the jury that "[c]apital punishment is the law of this State and you have to follow the law." Defense counsel did not object to this comment.

Defendant first contends that these comments implied to the jury that imprisonment was not an alternative punishment for first degree murder in Illinois. We do not agree that the jury was misled. The trial judge correctly instructed the jury that the defendant would be sentenced to a sentence other than death if the jury was unable to unanimously find that there were no mitigating factors sufficient to preclude the imposition of the death penalty. (See *People v. Tenner* (1993), 157 Ill. 2d 341, 384.) The trial judge also instructed the jury that closing arguments are not evidence and that statements not based on the evidence should be disregarded. We therefore do not believe that the comments denied the defendant a fair capital sentencing hearing.

Defendant next argues that the prosecutor's comments improperly implied that a penalty other than death would allow the defendant to commit future crimes against society. (See *People v. Johnson* (1991), 146 Ill. 2d 109, 148; *People v. Szabo* (1983), 94 Ill. 2d 327, 367 (prosecutor in sentencing hearing may not prey on fears of jurors that a defendant may walk the streets again and harm another).) Here, however, the comments were brief, the State introduced substantial evidence in aggravation, and the defendant introduced minimal evidence in mitigation. We therefore do not believe that

the brief comments were so prejudicial that they denied the defendant a fair sentencing hearing.

### (2)

The prosecutor further told the jurors that they were "the only barrier between good and evil" and "the only barrier between justice and injustice." The prosecutor also asked the jurors to "[s]how the world that good can triumph over evil." Defendant argues that these comments mischaracterized the jury's role, diverted its attention from its proper consideration of mitigating and aggravating factors, and shifted its attention away from giving consideration to the offense and the offender. In addition, the defendant argues that these comments improperly implied to the jury that it would be siding with "evil" and "injustice" if it did not impose the death penalty. Defendant did not object to these comments at the sentencing hearing, but requests that this court review these comments under the plain error rule.

We believe that these comments, considered in context, were made to emphasize the defendant's extensive criminal history. Furthermore, we do not believe that the defendant was denied a fair sentencing hearing. The trial judge defined both aggravating and mitigating factors in the jury instructions, and the jury was instructed to consider all of those factors. In addition, both the jury instructions and the verdict forms informed the jurors that if they were unable to unanimously find that there were no mitigating factors sufficient to preclude the imposition of the death penalty, the court would impose a sentence other than death. We find that the jury was fully informed of its role in imposing the death penalty and that the jury's attention was not diverted from consideration of the offense, the offender or the relevant aggravating and mitigating evidence.

### (3)

Defendant next argues that the prosecutor improperly argued to the jury that the defendant was trying to avoid responsibility for the murder by presenting mitigating evidence. Specifically, the prosecutor argued as follows:

> "He [defendant] just wants to get away with this. Don't let him get away with it. Hold him accountable for what he did to that woman on July 7th, 1991. He is accountable. Don't let him escape responsibility for the rape and murder of Judy Zeman. Enforce our law."

Defendant further objects to the prosecutor's comment that:

> "It appears that he [defendant's father] was a *** rotten father ***. But Ed [defendant] wants to use that as an excuse ***. Don't blame me for setting Judy on fire, because I had a rotten father. The excuse doesn't wash. It doesn't excuse what he did."

Defendant asserts that consideration of a tumultuous family background as a mitigating factor is proper, and that its consideration does not "suggest an absence of responsibility for the crime of murder." (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 116, 71 L. Ed. 2d 1, 12, 102 S. Ct. 869, 877.) Defendant did not object to these comments at the sentencing hearing, and he thus waived the issues. (*Enoch*, 122 Ill. 2d at 188-90.) He urges this court to review the issues under the plain error doctrine.

We do not believe that the prosecutor's comments rose to the level of plain error. This court has noted that a heinous murderer is not necessarily excused by his having had an abusive father. (*People v. Gacy* (1984), 103 Ill. 2d 1, 102-03 ("[a] disapproving father does not excuse 33 homosexually related murders and numerous other incidents of sexual torture and physical abuse").) Furthermore, the trial court properly instructed the jury to consider all mitigating factors supported by the evidence. We do not find that the prosecutor's remarks

were erroneous or were likely to have affected the jury's determination.

(4)

Defendant next contends that the prosecutor in closing argument improperly shifted the jury's sense of responsibility for imposing the death penalty, in violation of *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633. In *Caldwell*, the Court vacated a death sentence when the prosecutor led the jury to believe that responsibility for determining the propriety of the death penalty rested with an appellate court rather than the jury. (*Caldwell*, 472 U.S. at 328-29, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639.) In so holding, the Court noted that an uncorrected attempt to shift responsibility for the ultimate determination of death from the jury to others creates an "intolerable danger that the jury will in fact choose to minimize the importance of its role." *Caldwell*, 472 U.S. at 333, 86 L. Ed. 2d at 242, 105 S. Ct. at 2642.

In this case, defendant contends that, if the jury believed certain comments made by the prosecutor in closing argument, the jury would have believed that a decision to impose death had already been made by the legislature, minimizing the importance of the jury's role. While defendant failed to object to the challenged comments discussed below, he urges this court to review under the plain error rule.

Defendant first objects to the prosecutor's comment to the jury that "[c]apital punishment is the law of this State and you [the jury] have to follow the law." Considered in context, we believe that this comment was an invited response to defense counsel's argument in closing regarding the merits of capital punishment. As such, defendant may not now claim prejudicial error. (*Nevitt*, 135 Ill. 2d at 454.) Furthermore, the prosecutor stated at least four times in closing argument that the

death penalty shall be imposed only if the jurors find no mitigating factors sufficient to preclude the imposition of the death penalty. The instructions and the verdict forms also informed the jurors of the standard for imposing the death penalty. We do not believe that the comments were improper or would have affected the jury's determination.

Defendant next asserts that the prosecutor said that the law "requires" the death penalty, and objects to this comment. The prosecutor stated in part:

> "If you walk into that jury room and you find that the mitigating factors are not sufficient to preclude the imposition of the death penalty, the law says that you have to do it [impose the death penalty]. The facts in this case compel it. The law requires it. Justice absolutely demands it. There are no mitigating factors sufficient to preclude capital punishment."

We believe that, considered in context, the prosecutor was simply arguing that no mitigating factors in this case should have precluded the imposition of the death penalty. Furthermore, the jurors were instructed as to the alternatives to the imposition of the death penalty. As stated, the prosecutor also repeatedly informed the jury of the correct standard for imposing the death penalty.

Defendant next points to the prosecutor's assertions that "Edward Moore sentenced himself to death," and argues that these comments improperly led the jury to believe that ultimate responsibility for a death sentence rested with the defendant's conduct and not with the jury. (See *Buttrum v. Black* (N.D. Ga. 1989), 721 F. Supp. 1268, *aff'd per curiam* (11th Cir. 1990), 908 F.2d 695.) In *Buttrum*, the court found a *Caldwell* violation when the prosecutor argued that a defendant had " 'signed her own death warrant' " and that the jury was merely a cog in the criminal process. (*Buttrum*, 721 F. Supp. at 1316.) The court believed that the comments suggested

to the jury that ultimate responsibility rested with the defendant, and believed that the argument may have affected the sentencing decision. *Buttrum*, 721 F. Supp. at 1317.

Unlike the court in *Buttrum*, we do not believe that the comments here would have affected the jury's sentencing decision. The prosecutor repeatedly informed the jurors of their responsibility for weighing the factors and then determining whether the death penalty should be imposed. The jurors were also instructed as to their responsibility to determine whether the death penalty should be imposed. The comments may also have been interpreted as merely emphasizing the strength of the aggravating evidence. See *People v. Page* (1993), 155 Ill. 2d 232, 282.

Furthermore, in *People v. Hudson* (1993), 157 Ill. 2d 401, 460-61, this court found that comments similar to those made by the prosecutor in this case were invited by defense counsel's closing argument in which he suggested that the jury should feel guilty for imposing a death sentence. (*Hudson*, 157 Ill. 2d at 460-61.) We believe that the comments here, considered in context, were also invited by defense counsel's emotional pleas in closing argument.

Finally, defendant argues that the trial judge violated *Caldwell* by failing to sustain his objection to the prosecutor's suggestion that the jury did not have ultimate responsibility for determining the death penalty. While the trial judge did not state that he was sustaining the objection, he did respond that he would instruct the jury as to the law in this case. Indeed, the trial judge twice instructed the jury that it was responsible for imposing the death sentence. We do not find that the trial judge's failure to specifically sustain the objection denied the defendant of a fair capital sentencing hearing.

VI. Constitutionality of Death Penalty Statute

Defendant argues that the Illinois death penalty statute is unconstitutional. He first contends that the statute violates the eighth and fourteenth amendments because it places the burden of proof on a defendant, which precludes meaningful consideration of mitigating evidence. This court has previously rejected this challenge (see *People v. Edgeston* (1993), 157 Ill. 2d 201, 247), and we see no reason to reconsider the issue.

Defendant next argues that the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. The defendant concedes that this court has previously upheld certain portions of the Illinois death penalty statute and accompanying jury instructions. (See *People v. Whitehead* (1987), 116 Ill. 2d 425, 460-65; *People v. Albanese* (1984), 102 Ill. 2d 54, 81-82.) He requests, however, that this court reconsider issues relating to the Illinois death penalty statute, and determine whether, when considered as a whole, the issues render the statute invalid. This argument has been previously considered and rejected by this court. (*People v. Simms* (1991), 143 Ill. 2d 154, 185; *People v. Morgan* (1991), 142 Ill. 2d 410, 473; *People v. Thomas* (1990), 137 Ill. 2d 500, 549-50; *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.) We decline defendant's invitation to reconsider these issues.

Finally, defendant argues that the Illinois death penalty statute is unconstitutional as applied to him because a jury instruction that is based on a portion of the death penalty statute permits the sentencer to weigh vague aggravating factors. The portion of the instruction at issue provides that aggravating factors include not only statutory aggravating factors but also "[a]ny other reason supported by the evidence why the defendant should be sentenced to death." (Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992); see

also Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(c), (g).) The defendant argues that this instruction created an unacceptable risk that the jury in the instant case would find an aggravating factor on the basis of improper considerations, such as his history of mental problems. He further argues that there are no built-in safeguards in the category of "any other reason" to prevent, or minimize the risk of, an arbitrary and capricious factor in the penalty determination. This court has considered and rejected similar challenges to nonstatutory aggravating factors on the basis of vagueness. (*People v. Todd* (1992), 154 Ill. 2d 57, 75-76; *People v. Owens* (1984), 102 Ill. 2d 88, 109-10; *People v. Free* (1983), 94 Ill. 2d 378, 426-27.) We find that the defendant has offered no persuasive reason to now depart from these holdings.

\* \* \*

For the reasons stated, the judgment of the circuit court of Grundy County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, May 21, 1996, as the date on which the sentence of death entered in the circuit court of Grundy County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*