(No. 70147.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. VICTOR L. GANUS, Appellant.

*Opinion filed March 26, 1992.—Rehearing denied June 25, 1992.*

MILLER, C.J., specially concurring.

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

468

Roland W. Burris, Attorney General, of Springfield (Rosalyn Kaplan, Solicitor General, and Terence M. Madsen and Douglas K. Smith, Assistant Attorneys General, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Defendant, Victor Ganus, was convicted by a jury in Randolph County circuit court of three counts of murder. At sentencing, the jury determined that defendant was eligible for the death penalty based on the fact that defendant had murdered two or more individuals and that the victim in this case was an inmate of a correctional institution. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(b)(2), (b)(3).) Finding factors in aggravation, the jury returned a verdict of death. Defendant's execution was stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).

Defendant was arrested on November 16, 1988, following an oral statement in which he admitted his involvement in the death of Lucas Gonzales. In his statement, to which Department of Corrections Investigator Terry Neathery testified at trial, defendant stated that on November 5, 1988, while an inmate at Menard Correctional Institution, he "thought about robbing and murdering inmate 'Hollywood' [Gonzalez] who lived in Cell 530 Westhouse." Defendant described how he prepared for the murder, taking the wire from his broom and wrapping it around two pieces of wood, and securing a knife. Defendant then requested that two other inmates vacate their cell (523) in the afternoon of November 5, 1988. Defendant went to Cell 523 after lunch and waited for Gonzales, a fellow inmate, to be left alone in his neighboring cell. When defendant determined that Gonzales was alone, he entered his cell, choked him with

a wire and told him that "he [Gonzales] raped the wrong bitch out in the street." Defendant stated that he learned this information from other inmates as part of his duty as cellhouse security chief for the Latin Kings gang. After defendant determined that Gonzales was unconscious, he stabbed him in the chest and placed him on the bed with a pillow under his head and a towel over the stab wounds.

Prison officials testified that they were called to Cell 530 by Thomas Johnson, Gonzales' cellmate. Johnson had discovered Gonzales lying on the bed and suspected that he had passed out from drinking. Unable to obtain a pulse from Gonzales, Johnson notified officials, who called for medical assistance. Upon examining Gonzales, prison officers noted four stab wounds to his chest which were covered with a towel. Other officers processed the cell for fingerprints and other evidence. Their investigation revealed a piece of wire with two small blocks of wood tied to the ends inside a brown paper bag.

Inmates Kevin Taylor and Randall Long testified that defendant asked them to vacate their cell on the afternoon of November 5, 1988. They did so and returned to the cell at approximately 2:30 p.m. When they returned to their cell, a towel like that found covering the victim's wounds was missing.

Dr. Raj Nanduri testified that he performed the autopsy on Gonzales. He testified that Gonzales suffered blunt trauma to the neck, the likely cause of which was strangulation. Dr. Nanduri believed the causes of death to have been asphyxiation due to strangulation and hemorrhagial shock, or blood loss, from the stab wounds. He identified photographs of the stab wounds to Gonzales' chest.

Defendant did not testify on his own behalf, and following testimony, the jury convicted defendant of three counts of murder. The jury then found defendant eligible

for the death penalty and heard evidence in aggravation and mitigation. Evidence in aggravation included testimony that defendant had attempted to stab another inmate on April 19, 1988. At that time, defendant told investigators that he was ordered by the Latin Kings to stab the other inmate. Additionally, prison officials testified that weapons had been found in defendant's cell on previous occasions.

In mitigation, the jury heard a stipulation that defendant had offered his cooperation to the State with respect to the investigation of Gonzales' death if the State would waive the death penalty. Additionally, the jury heard testimony from four of defendant's family members, his former Boys' Club director, and David Randall, a psychologist and sentencing consultant.

Defendant's uncle, mother, brother and sister testified to defendant's abusive childhood, relating incidents of physical and emotional violence by his father. His sister and brother further testified to his self-destructive young adulthood. Robert Fox, a manager at the Rockford Boys' Club, testified that defendant had participated in Boys' Club activities for 10 years, consistently spending his after-school and evenings at the club. Fox stated that defendant was a leader and never caused any problems at the club. He stated that he knew that defendant had a fear of his father. Finally, David Randall testified concerning a report he had prepared detailing defendant's abusive family life, drug and alcohol problems. On cross-examination, Randall stated that he had not interviewed defendant's father, although he had interviewed other family members. Defendant was subsequently sentenced to death.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first contends that he was denied his sixth amendment right to effective assistance of counsel. At

trial, defense counsel questioned two fellow inmates of defendant, Officer Darryl Jones and Investigator Terry Neathery about gang activity at Menard, defendant's gang activity and the relation of the Gonzales murder to any gang activity. Defendant claims that defense counsel rendered ineffective assistance of counsel when he elicited prejudicial testimony about gang activity and defendant's ties thereto, in attempting to prove the affirmative defense of compulsion to the offense of murder. The defense of compulsion is not an affirmative defense available to defendant, as he is charged with an offense punishable by death. (*People v. Gleckler* (1980), 82 Ill. 2d 145; Ill. Rev. Stat. 1987, ch. 38, par. 7—11(a).) Defendant contends that his counsel labored under the misconception that compulsion was an available defense.

The standard for a determination of ineffective assistance of counsel is set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. *Strickland* established a two-prong test for judging attorney performance: first, that counsel's representation fell below an objective standard of reasonableness; second, that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland*, 466 U.S. at 690, 694, 80 L. Ed. 2d at 695, 698, 104 S. Ct. at 2066, 2068.) The burden of proving prejudice rests with the defendant. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) This court adopted the *Strickland* standard in *People v. Albanese* (1984), 104 Ill. 2d 504. Defendant has failed to meet the burden of demonstrating ineffective assistance of counsel.

The record reveals that defense counsel was faced with the predicament of formulating a defense for a client who faces the death penalty by reason of his own detailed, Mirandaized statement, but who refuses to testify in his own defense. The record shows that counsel, in

forging a defense, consulted with legal experts on death penalty trials, and even obtained court funds to retain an expert in the field of mitigation at death penalty hearings. Defense counsel finalized a strategy and obtained defendant's consent to same.

In terms of defense strategy, the gang-activity evidence was legitimate, even though defendant was not entitled to a compulsion defense. Through his cross-examination of State witnesses, defense counsel established that the victim had raped someone on the outside who may have been a member or associate of a gang, that defendant's position in the gang was such that he would definitely be subject to orders from those higher in the organization, that to disobey a gang order could lead to being killed, and that most of the killings in prison were gang-related. Counsel was able to add to this evidence later at sentencing and formulate his mitigation argument. At the sentencing hearing, counsel argued that the murder was mitigated by having been coerced by the Latin Kings with the threat of death, that a sentence of natural life imprisonment would be, under the circumstances, a punishment as severe as the death penalty in terms of retribution, and that if defendant lived he could help the prison officials end the dangerous situation of gang domination at Menard.

Regardless of defense counsel's intentions regarding compulsion, this evidence was relevant as mitigation, and its use as such was defense counsel's principle reason for eliciting it. Counsel's chosen concentration was the prevention of defendant's death—a legitimate strategy given the unique circumstances of this case. Defense counsel's actions cannot be characterized as unreasonable under the first prong of the *Strickland* standard.

Additionally we note that defendant fails to meet the second prong of the *Strickland* test: that there is a reasonable probability that but for counsel's actions, the

outcome of the trial would have been different. The record is replete with evidence corroborating defendant's confession. The handmade wire garrote found in the victim's cell matched the description given by defendant of the weapon used to choke Gonzales. Defendant described using a towel from a nearby cell to cover the stab wounds inflicted on the victim, and Long and Taylor testified that a similar towel was missing from their cell after defendant used it. Finally, defendant's descriptions of the murder are supported by the autopsy results.

These examples support our conclusion that defendant's conviction was the result of a highly corroborated confession, rather than inflammatory gang evidence. Given the strong nature of the evidence, it cannot be said that the jury would likely have acquitted defendant had defense counsel not established a foundation at trial for his coercion and offer-of-cooperation evidence in mitigation. The second prong of the *Strickland* test was not established. Defendant was not denied effective assistance of counsel.

We are aware of some similarities between the instant case and *People v. Hattery* (1985), 109 Ill. 2d 449, wherein this court held that trial counsel's conduct was *per se* ineffective. In *Hattery*, defendant had pled not guilty to a murder charge. His counsel's trial strategy consisted of admitting that the defendant was guilty of murder but was not deserving of the death penalty. Defendant did not consent to that trial strategy. In the instant case, on the other hand, defendant's counsel's trial strategy was consented to by defendant. What the instant case presents is a situation where the defendant literally had no defense. Evidence of his guilt was overwhelming. His counsel conceived a compulsion defense which, though not a legal defense, could or might have persuaded a jury not to convict. Jury nullification is always a possibility. It is not inconceivable that a compul-

sion defense might have evoked empathy, compassion or understanding and sympathy in the minds of the jurors. It is a truism that if a man is drowning, he will grasp at a straw that comes floating by. A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense. In this case it would appear that defense counsel used his imagination and resourcefulness to come up with something where he had nothing to go on.

## ALLEGED TRIAL ERRORS

### *Jury Selection*

Defendant also argues that jury selection was improper in that the trial court erred in excluding venireman Loren Wolters for cause. During jury selection, Wolters informed the court that under no circumstances would he sign his name to a verdict imposing the death penalty. Defense counsel posed a question to Wolters concerning whether he would reconsider his position on the death penalty if the defendant had killed his entire family in a particularly heinous manner. Wolters indicated that such a situation might make him question his position against the death penalty. In excusing Wolters, the court found that his views on capital punishment would substantially impair the performance of his duties as a juror. Defendant claims that Wolters' response to defense counsel's question indicated that Wolters could potentially vote for a death penalty verdict. Therefore, the court should not have excused him for cause. A venireman's professed inability to sign the death warrant forms and impose the death penalty has been held to indicate that that venireman would not meet the requisite standard for performance of his duties as a juror. (*People v. Brisbon* (1989), 129 Ill. 2d 200.) A potential exception to that opposition resulting from defense coun-

sel's unrealistic hypothetical does not invalidate the trial court's excusal for cause. *People v. Stewart* (1984), 104 Ill. 2d 463.

## Prosecutor's Comments

Defendant next objects to the prosecution's question of defense witness David Randall. Randall, a sentencing consultant and psychologist, testified from a report prepared on defendant's abusive childhood. On cross-examination, the State asked Randall whether defendant's father had been interviewed as a part of the report. Defendant argues that this line of questioning was improper. The prosecution again mentioned Randall's report in closing arguments. Defendant objects to its use there as well. We first note that defendant failed to raise objection to the prosecution's cross-examination at trial, nor did he move for mistrial or include the error in a post-trial motion. Failure to do so resulted in a waiver of the issue. (*People v. Nuccio* (1969), 43 Ill. 2d 375; *People v. Brooks* (1988), 175 Ill. App. 3d 136.) We note, however, that our review of the record indicates that the prosecutor's cross-examination and closing argument were proper.

## Sentencing Hearing

Defendant also challenges the fairness of his sentencing hearing, where a brief hearsay reference to his prior crimes was made during trial. During his trial testimony, Officer Darryl Jones was asked what had focused suspicion on the defendant prior to his confession. Jones replied that information from other inmates had led to suspicion of defendant. Jones then went on to state that he had learned the defendant's criminal record from his file and noted a "murder with a wire, the same style murder," and "an attack upon another inmate out on the street just recently." Defendant argues that Jones' state-

ment at trial made his sentencing hearing unreliable because Jones was not a firsthand witness to those events.

Although there is no evidence in the record that defendant's previous conviction involved a wire garrote murder, the record does indicate that defendant was convicted of a stabbing murder. Additionally, the attack on an inmate referred to by Jones occurred inside Menard, not on a public street. Defendant's prior murder conviction was proven as an eligibility factor at the sentencing hearing. At the aggravation and mitigation phase of the hearing, the State proved the previous attack on another inmate. While it is possible that Jones' memory was inaccurate, his inadvertent mention of the same crimes evidence did not prejudice defendant.

The remainder of defendant's arguments are: (1) that the trial court abused its discretion in allowing photographs of the victim's stab wounds in the jury room during deliberation; and (2) that the jury's sense of responsibility in sentencing was diminished by a statement made about the victim by a venireman during *voir dire*. These arguments are barred by waiver.

## CONSTITUTIONALITY OF THE DEATH PENALTY

Defendant asserts that the death penalty statute is unconstitutional in that it places a burden of proof on the defendant which precludes meaningful consideration of mitigation and does not sufficiently minimize the risk of arbitrary and capricious sentences. Defendant's arguments have previously been considered and rejected by this court, and we continue to adhere to those stated positions on these issues. See *People v. Morgan* (1991), 142 Ill. 2d 410; *People v. Phillips* (1989), 127 Ill. 2d 499.

## CONCLUSION

For the reasons set forth above, we affirm the

defendant's convictions and sentence of death. The clerk of this court is directed to enter an order setting Wednesday, September 30, 1992, as the date on which the sentence of death is to be carried out. The defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Affirmed.*

CHIEF JUSTICE MILLER, specially concurring:

I concur in the court's judgment but write separately to explain further my conclusion that trial counsel was not ineffective.

As the majority opinion explains, counsel's presentation of evidence that could, in a proper case, support a compulsion defense enabled counsel to establish, at an early point in the proceedings, a theory of mitigation. The choice of evidence to present is a matter of trial strategy to which a court considering a claim of ineffective assistance will normally defer. *Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065; *People v. Barrow* (1989), 133 Ill. 2d 226, 247.

I do not agree with the majority's suggestion, however, that the defendant's consent to counsel's strategic choice was necessary. (148 Ill. 2d at 473.) A defendant alleging ineffective assistance must generally show that counsel's performance was deficient and that the defense was prejudiced as a result. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27 (adopting *Strickland* standard).) The burdens of production and persuasion are on the defendant; except in

rare cases, courts do not presume the existence of either of these elements. For the reasons stated in my dissenting opinion in *People v. Hattery* (1985), 109 Ill. 2d 449, 468 (Miller, J., dissenting), I continue to believe that a defendant should not be relieved from establishing the *Strickland* components merely on the ground that counsel pursued, without the defendant's of-record consent, a trial strategy that effectively acknowledged the defendant's guilt to the trier of fact.

The evidence of consent relied on by the majority in the present case demonstrates the practical difficulty of imposing such a requirement on the ineffective-assistance inquiry. In its discussion, the majority apparently is alluding to an entry in trial counsel's fee petition, submitted after the conclusion of the sentencing hearing. In that entry, counsel states that on a specified date he "outline[d] proposed strategy after having secured client's approval for defense"; there is no indication of what counsel told the defendant on that occasion. If counsel had failed to make this particular entry, with its oblique reference to the client's consent, would the majority then conclude that the defendant had established his claim? I do not believe that *Strickland* requires—or that *Hattery* contemplates—our combing records for whatever evidence of consent might be discerned.