THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEE M. SMITH, Defendant-Appellant.

Fourth District    No. 4—97—0079

Argued January 28, 1998.—Opinion filed May 4, 1998.

436

STEIGMANN, J., specially concurring.

Daniel D. Yuhas, Elizabeth D. Caddick, and Jenifer Johnson (argued), all of State Appellate Defender's Office, of Springfield, for appellant.

Patrick W. Kelley, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Perry L. Miller (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Following a jury trial in the circuit court of Sangamon County, defendant Dee M. Smith was found guilty of aggravated battery. 720 ILCS 5/12—4(b)(8) (West 1994). She was sentenced to 24 months' probation. The issues are whether (1) defendant was denied effective assistance of counsel and due process because the defense trial counsel failed to request and the trial court failed to order a fitness hearing even though defendant was receiving prescribed psychotropic medication at the time of trial and sentencing and (2) the trial court committed an abuse of discretion by answering "no" to the jury's question of whether the jury had "the option of downgrading to a charge of battery," even if it had found the elements of aggravated battery had been proved. Only the facts relevant to the issues will be discussed.

The defendant's presentence investigation report contained information from medical doctors, a clinical psychologist, and defendant concerning the use of Effexor and Xanax, and treatment for symptoms of depression and anxiety. The State does not dispute that defendant may have received multiple prescriptions of Xanax and Effexor prior to, around the time of, and subsequent to her trial and sentencing hearings. Also undisputed is that the fitness hearing was not asked for by defendant's trial counsel or provided to defendant prior to trial or sentencing and that Xanax and Effexor are psychotropic medications.

The State argues that the amended version of section 104—21 of

the Code of Criminal Procedure of 1963 (725 ILCS 5/104—21 (West 1996)) applies to this case so that reversal is not automatically required. This court has considered the same argument in *People v. Straub*, 292 Ill. App. 3d 193, 197-99, 685 N.E.2d 429, 432-33 (1997), and rejected it. We deem *Straub* controlling and decline to revisit the issue. See also *People v. Cortes*, 181 Ill. 2d 249, 275 (1998).

■ This case differs somewhat from *Straub* in that the amendment to section 104—21 effective December 31, 1996 (Pub. Act 89—689, § 90, eff. December 31, 1996 (1996 Ill. Laws 3792)), was effective at the time of defendant's sentencing. It was not in effect, however, when she was tried. In addition, the *Straub* court did not find ineffective assistance of counsel or an abuse of discretion in failing to conduct a fitness hearing because (1) there was no evidence defendant was taking the prescribed medication, (2) two evaluations found defendant fit to stand trial, (3) the trial court was fully aware of defendant's physical and mental problems and medication and took great pains to assure that defendant's medication did not affect his ability to understand the proceedings and to cooperate in his defense, and (4) defendant's counsel understood the obligation to raise fitness as an issue and the trial court could rely on defense counsel's representation that there was no problem. *Straub*, 292 Ill. App. 3d at 199-200, 685 N.E.2d at 434. The record in the case at bar would not support such findings.

In *People v. Kilpatrick*, 293 Ill. App. 3d 446, 448-49, 688 N.E.2d 1202, 1204 (1997), the court adopted *Straub* and rejected the State's cited cases of *People v. Perry*, 292 Ill. App. 3d 705, 686 N.E.2d 677 (1997), and *People v. Gibson*, 292 Ill. App. 3d 842, 687 N.E.2d 1076 (1997). As a result, in *Kilpatrick*, the cause was remanded for a hearing to determine defendant's fitness to stand trial. *Kilpatrick*, 293 Ill. App. 3d at 450, 688 N.E.2d at 1205. As in *Kilpatrick*, the trial court should determine defendant's fitness to stand trial.

The next issue is whether the trial court committed an abuse of discretion by answering "no" to the jury's question of whether it could downgrade to a charge of battery even if it had found the elements of aggravated battery had been proved.

At trial, prior to jury deliberations, the trial court's instructions to the jury included the following instructions:

> "The defendants are charged with the offense of aggravated battery. The defendants have pleaded not guilty. Under the law, a person charged with aggravated battery may be found (1) not guilty; or (2) guilty of aggravated battery; or (3) guilty of battery."

See Illinois Pattern Jury Instructions, Criminal, No. 2.01 (3d ed. 1992) (hereinafter IPI Criminal 3d).

"A person commits the offense of battery when he knowingly without legal justification and by any means causes bodily harm to another person."

See IPI Criminal 3d No. 11.05.

"A person commits the offense of aggravated battery when she knowingly without legal justification and by any means causes bodily harm to another person, and in doing so, she is on or about a public place of amusement."

See IPI Criminal 3d No. 11.15.

"To sustain the charge of aggravated battery the State must prove the following propositions:

First proposition: that the defendant or one for whose conduct he is legally responsible knowingly caused bodily harm to Michelle Ray; and

Second proposition: that the defendant did so while on or about a public place of amusement.

Third proposition: that the defendant was not justified in using the force which she used.

If you find from your consideration of all the evidence that each one of these propositions has been proven beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

See IPI Criminal 3d No. 11.16.

During deliberations, the jury sent an inquiry to the trial judge. The trial judge's discussion with the attorneys concerning the inquiry was as follows:

"THE COURT: The note which I am marking as Court's Exhibit 1 states: ['']Your Honor, twelve out of twelve agree to meeting the following propositions: one, defendants knowingly caused harm to Miss Ray; two, did the above in a public place of amusement; three, degree of force was not justified. Realizing this indicates aggravated battery, do we have the option of downgrading to a charge of battery?[']

What would you like me to respond, [defendant's attorney]?

[DEFENDANT'S ATTORNEY]: Well, I mean I think the answer to the question is yes, under—you know, they can do whatever they decide to do unanimously.

THE COURT: But they have already said they found them guilty of aggravated battery in a public place of amusement.

[DEFENDANT'S ATTORNEY]: But also indicated they don't feel that is a just verdict, but that's reading between the lines; and jury nullification is an appropriate—

THE COURT: May I point out that had we instructed as I indicated we should, we might not be having this problem at this point?

[Prosecutor], what do you propose I respond?

[PROSECUTOR]: Your Honor, I think that they've got the verdicts back there. If they want to come back with a battery, they can elect to do that; and I don't think we should advise them one way or other which verdict form they should use.

THE COURT: What they just said to me—[prosecutor], let me read it again. Defendants knowingly caused harm to Miss Ray. They did it in a public place of amusement. It was not justified. They realize this constitutes aggravated battery, and they want to know that even though they find proposition 1, 2, and 3, can they find—can they downgrade to battery. That's against my instructions.

[PROSECUTOR]: That's right.

THE COURT: So I am going to indicate no in response to the question.

[DEFENDANT'S ATTORNEY]: Then that would be a response over our objection.

THE COURT: Yes, over defendant's objection."

The determination of whether to issue supplemental instructions in response to an inquiry from the jury rests in the discretion of the trial court, and the trial court has a duty to provide supplemental instructions where clarification is requested, the original instructions are incomplete, and the jurors are manifestly confused. *People v. Oden*, 261 Ill. App. 3d 41, 45-46, 633 N.E.2d 1385, 1389 (1994).

"[T]he general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion. (*Reid*, 136 Ill. 2d at 39.) This is true even though the jury was properly instructed originally. (See *People v. Morris* (1980), 81 Ill. App. 3d 288, 290-91.) When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy (*Bollenbach v. United States* (1945), 326 U.S. 607, 612-13, 90 L. Ed. 350, 354, 66 S. Ct. 402, 405; *People v. Caballero* (1984), 102 Ill. 2d 23, 42; see *People v. Harmon* (1968), 104 Ill. App. 2d 294, 301, relying on 23A C.J.S. *Criminal Law* § 1376, at 305 (1989)). If the question asked by the jury is unclear, it is the court's duty to seek clarification of it. (See *People v. Land* (1975), 34 Ill. App. 3d 548, 550-51; *Harmon*, 104 Ill. App. 2d at 301.) The failure to answer or the giving of a response which provides no answer to the particular question of law posed has been held to be prejudicial error." *People v. Childs*, 159 Ill. 2d 217, 228-29, 636 N.E.2d 534, 539 (1994).

440

These principles have recently been reaffirmed by the Supreme Court of Illinois. *Cortes*, 181 Ill. 2d at 280.

■ The trial court in this case did comply with *Childs* by giving a direct response to the question, and defendant's counsel objected to that response. On appeal, defendant argues that the trial court's response negated the jury's power of "nullification" or "lenity."

Although jury nullification is a possibility (see *People v. Ganus*, 148 Ill. 2d 466, 473, 594 N.E.2d 211, 215 (1992)), the defendant has no right to argue or instruct on jury nullification (*People v. Moore*, 171 Ill. 2d 74, 109-10, 662 N.E.2d 1215, 1231-32 (1996)). We also agree with the statement in *People v. Montanez*, 281 Ill. App. 3d 558, 565, 667 N.E.2d 548, 553 (1996), "The power of jury nullification exists, but it is not authorized by the law. A defendant has no right to have the jury defy the law or ignore the undisputed evidence." The question indicated all 12 jurors agreed that all the elements of aggravated battery had been proved. The answer given by the trial court to the jury's inquiry in this case was direct and simply paraphrased an instruction already given to it.

"If you find from your consideration of all the evidence that each one of these propositions has been proven beyond a reasonable doubt, you should find the defendant guilty."

See IPI Criminal 3d No. 11.16. Furthermore, the jurors were provided three verdict forms: (1) not guilty, (2) guilty of aggravated battery, and (3) guilty of battery. They were instructed to select the verdict form which reflected their verdict as to defendant. IPI Criminal 3d No. 26.01. In addition, they were advised that the jury instructions contained the law applicable to this case and that it was their duty to follow all the instructions and not to disregard some. IPI Criminal 3d No. 1.01. In this case, the response given by the trial judge to the jury's inquiry was the correct response in light of the objection raised by defendant. The trial court's response clarified the confusion. That response did not result from an abuse of discretion.

The judgment of the circuit court of Sangamon County is affirmed, and the cause is remanded for a limited fitness hearing to determine defendant's fitness to stand trial. If the trial court determines the defendant's medications compromised her ability to understand the nature and purpose of the proceedings against her or her ability to assist in her defense, the conviction is to be vacated and defendant given a new trial. If the trial court determines that defendant was fit to stand trial, the trial court is directed to enter a retro-

spective fitness finding, and defendant's conviction and sentence will stand.

Affirmed and remanded with directions.

GREEN, J., concurs.

JUSTICE STEIGMANN, specially concurring:
Although I agree with the majority opinion, I write specially to express my rejection of the legitimacy of the concept of jury nullification. However much surface appeal that concept may have, careful analysis shows it to be vacuous and intellectually bankrupt.

Jury nullification constitutes the proposition that the jury may disregard the law as provided by the trial court and instead decide a case based upon considerations that have no legal justification, such as the race, character, or status of either the victim or the accused. Supporters of jury nullification cite instances in which juries have supposedly achieved "true justice" by acquitting a defendant when the evidence concededly proved him guilty beyond a reasonable doubt. Leaving aside the many flaws in such examples, the primary difficulty with the concept of jury nullification is that no principled basis exists for claiming that a jury may choose to disregard the court's instructions on the law *only* when such disregard benefits the accused.

In every criminal case, the trial court instructs the jury on principles of law that are designed to protect the accused, such as the following: (1) the defendant is presumed innocent of the charge against him, and the State has the burden of proving the charge beyond a reasonable doubt (Illinois Pattern Jury Instructions, Criminal No. 2.03 (3d ed. 1992) (hereinafter IPI Criminal 3d)); (2) the defendant is not required to prove his innocence (IPI Criminal 3d No. 2.03); (3) if the defendant does not testify, that fact may not be considered against him in any way (IPI Criminal 3d No. 2.04); and (4) neither sympathy nor prejudice should influence the jury (IPI Criminal 3d No. 1.01).

In almost all criminal cases, the trial court also instructs the jurors that they should not discuss the case with anyone or attempt to do any investigating themselves, such as going to the scene of the crime and examining it. The court further instructs the jury not to read any newspaper accounts or listen to any media reports regarding the case on trial. The court also tells the jury that it should decide the case based solely upon the evidence and testimony presented in the courtroom and not on extraneous matters. See IPI Criminal 3d No. 1.01.

In addition to instructing the jury regarding things it must do or avoid doing to protect the defendant's rights, the trial court also defines the offense with which the defendant is charged and the State's burden of proof regarding the elements of that offense. For instance, the burglary issues instruction, which sets forth the three propositions that the State must prove, concludes with the following two paragraphs (which are the *same concluding paragraphs* in all but a few of the many dozen issues instructions contained in IPI Criminal 3d):

> "If you find from your consideration of all the evidence that each one of [the previously stated] propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." IPI Criminal 3d No. 14.08.

Supporters of jury nullification think the second of these paragraphs—the one instructing the jury that it must find the defendant not guilty if the State did not prove him guilty beyond a reasonable doubt—is just fine. Somehow, however, those same supporters claim that a jury may disregard the first paragraph of this instruction. But why should this be so? After all, if a jury is free to use its status as "representative of the community" or "the community's conscience" (or whatever else supporters of jury nullification claim gives the jury the prerogative to reject the trial court's instructions of law), then should the jury not be able to question *any* instruction that it finds questionable or archaic?

For instance, why should a jury accept the trial court's admonition that the defendant's failure to testify should not be held against him? Clearly, this admonition is counterintuitive. Most jurors would expect in their daily lives that someone accused of criminal behavior would provide some defense or explanation. Most jurors would also conclude that a person's failure to provide some explanation would indicate that he was guilty of the charge.

In fact, this real-world expectation is the law in almost every other jurisdiction in the world; it just so happens that in the United States, our courts have interpreted the fifth amendment to proscribe such an expectation by holding that a defendant cannot be punished for exercising his constitutional right of silence, even at trial. But, if—as the supporters of jury nullification contend—a jury can reject the trial court's instructions of law, what can be wrong with a juror's thinking the following:

> "Not holding a defendant's failure to testify against him might

have worked just fine 200 years ago when a bunch of rich, white guys wrote that protection into the Constitution to deal with the kinds of crimes and trials that occurred then, but clearly this archaic bit of colonial fluff has no legitimacy in the modern world of urban violence and street gang murders. It is a concept that has outlived its usefulness, and if it weren't for a bunch of bleeding-heart ACLU-types, we would have gotten rid of it a long time ago so that we could really get tough on vicious criminals."

I note in passing that the above argument might be particularly shocking to those who—in other contexts—endorse the concept of a "living constitution"—that is, the meaning of the constitution must "evolve" over time to meet the exigencies of modern society. Adherents of this view typically argue for a more expansive reading of the constitution, claiming that political positions the adherents deem desirable are required or protected by the constitution. However, no principled reason exists to limit the notion of a living constitution to only *expansion* of constitutional rights; if the constitution is as flexible as the adherents of the "living constitution" assert, then it can just as well diminish the protections it provides (if that is what modern society requires). Indeed, many legal scholars argue that such a reduction has already occurred regarding fourth amendment protections.

Another trial court instruction that a juror might question or disregard is the State's burden to prove the defendant guilty beyond a reasonable doubt. After all, this standard does not even appear anywhere in either the federal or state constitution. Instead, the United States Supreme Court has found this standard to be constitutionally mandated by looking to the history and traditions of this nation almost 210 years ago when the constitution was adopted. But so what? Why should a jury, acting as the modern day "conscience of the community," be limited in its real-world assessment of an accused's conduct by an "understanding" among a bunch of Virginia plantation owners and New England merchantmen, who were running around in three-cornered hats, frequently owned slaves, and observed other customs and practices that would be viewed as highly objectionable—or at least very strange—through modern eyes?

It will not suffice for supporters of jury nullification to point out that when a jury disregards the trial court's instructions and acquits, the State cannot appeal, whereas when a jury disregards the trial court's instructions and convicts, the defendant can appeal. First, the defendant's right to appeal on the basis of jury deliberations is extremely restricted. *People v. Towns*, 157 Ill. 2d 90, 112, 623 N.E.2d 269, 279 (1993) (in evaluating a verdict's validity, a reviewing court

may not consider evidence showing jury's deliberative process or its motives or methods in reaching the verdict); *People v. Lee*, 294 Ill. App. 3d 738, 744-45, 691 N.E.2d 117, 122 (1998) (jurors' affidavits in armed robbery case that they disregarded court's instructions not to consider during deliberations prosecutor's improper argument constituted improper effort to impeach jury's verdict). Thus, a defendant who presents affidavits or live testimony from a juror about the jury's disregard of the court's instruction not to hold against the defendant his failure to testify will lose on this claim because a jury is not permitted to impeach its own verdict. The same thing would happen to other claims, such as that the jury disregarded the defendant's presumption of innocence or intentionally lessened the State's burden of proving him guilty beyond a reasonable doubt.

Second, a defendant's appeal on this ground is premised upon a juror's willingness to talk about the jury deliberations and to admit that he or some other juror disregarded some of the court's instructions. However, jurors are under no obligation to speak to anyone about jury room discussions, and one could assume they would be particularly unlikely to do so if they had intentionally disregarded some of the court's instructions designed to provide procedural protections to the defendant, resulting in the defendant's conviction.

The historical circumstances that allegedly justified the concept of jury nullification have long since passed. Justice Harlan explained this best, as follows:

> "[The] principal original virtue of the jury trial—the limitations a jury imposes on a tyrannous judiciary—has largely disappeared. We no longer live in a medieval or colonial society. Judges enforce laws enacted by democratic decision, not by regal fiat. They are elected by the people or appointed by the people's elected officials, and are responsible not to a distant monarch alone but to reviewing courts, including this one." *Duncan v. Louisiana*, 391 U.S. 145, 188, 20 L. Ed. 2d 491, 518, 88 S. Ct. 1444, 1469 (1968) (Harlan, J, dissenting, joined by Stewart, J.).

These views are consistent with long-held views of other Supreme Court justices on point. At a time when Supreme Court justices served as trial judges, Justice Joseph Story wrote the following:

> " 'I deny that, in any case, civil or criminal, [jurors] have the moral right to decide the law according to their own notions or pleasure. On the contrary, I hold it the most sacred constitutional right of every party accused of a crime that the jury should respond as to the facts, and the court as to the law. It is the duty of the court to instruct the jury as to the law and it is the duty of the jury to follow the law as it is laid down by the court. *** Every person accused as a criminal has a right to be tried according to

the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness or ignorance or accidental mistake, to interpret it.' " *Sparf & Hansen v. United States,* 156 U.S. 51, 74, 39 L. Ed. 343, 351, 15 S. Ct. 273, 282 (1895), quoting *United States v. Battiste,* 24 Cas. 1042, 1043 (C.C.D. Mass. 1835) (No. 14,545).

As Professor Andrew D. Leipold of the University of Illinois pointed out in his thoughtful article, *Rethinking Jury Nullification,* 82 Va. L. Rev. 253, 294 (1996):

"Virtually every federal court that considered the question [of jury nullification] held, often in blunt language, that there was no right to have juries told of their power. The most detailed opinion came in *United States v. Dougherty*[, 473 F.2d 1113 (D.C. Cir. 1972), quoting *United States v. Moylan,* 417 F.2d 1002, 1009 (4th Cir. 1969),] where the court not only rejected the defendants' arguments, but denounced the whole notion of jury nullification:

'This so-called right of jury nullification is put forward in the name of liberty and democracy, but its explicit avowal risks the ultimate logic of anarchy. . . . "No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable." ' "

Regarding the claim of supporters of jury nullification that juries somehow constitute "representatives of the community," Professor Leipold cogently wrote the following:

"A jury is unelected, unaccountable to a constituency, and only obliquely a 'representative' of the area from which it is drawn. A jury need not represent a cross-section of the citizenry; the panel does not have to reflect the community's racial, gender, economic, or ethnic make-up; and some groups are routinely excluded from service by law or by practice. There is no reason to think that jurors know more than the average citizen about the impact of a criminal law on the community, and some reason to believe that they know less. And of course, jurors are strictly forbidden to discuss the case they are hearing with their neighbors, or otherwise to collect information on how the community feels before rendering a verdict." 82 Va. L. Rev. at 299.

Last, we should not forget the disgraceful episodes in our criminal justice system in the 1950s and 1960s when southern juries routinely acquitted those accused—including local law enforcement officers—of beating or killing civil rights protesters despite overwhelming evidence of guilt. With good reason, supporters of jury nullification choose not to remind us of those grim times, but those acquittals reflected the concept of jury nullification "in all its glory."

This court should join the other Illinois courts that have rejected this pernicious doctrine (see *People v. Montanez*, 281 Ill. App. 3d 558, 565, 667 N.E.2d 548, 553 (1996)) and emphasize that it has no place in any system of justice worthy of that name.