(No. 82376. ▪▪▪)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. VICTOR L. GANUS, Appellant.

*Opinion filed December 31, 1998.—Rehearing denied February 1, 1999.*

358

HARRISON, J., dissenting.

Anna M. Ahronheim, of the Office of the State Appellate Defender, and James Geis, both of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and William L. Browers, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Following a jury trial in the circuit court of Randolph County, defendant, Victor Ganus, was found guilty of first degree murder in connection with the death of Lucas Gonzales in October 1988. At the time of the murder, defendant was an inmate at the Menard Correctional Center where he was serving a natural life sentence for the 1985 murder of Richard Misslich. Lucas Gonzales, the victim in the present case, was a fellow inmate at

Menard. After the jury found defendant guilty of the murder of Gonzales, a bifurcated hearing was held before the same jury to determine whether defendant should be sentenced to death. The jury first determined that defendant was eligible for the death penalty on the basis of the statutory aggravating factors that defendant had been convicted of murdering two or more individuals (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3)) and also that the murdered individual was an inmate of an institution of the Department of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(2)). Thereafter, following the presentation of evidence in aggravation and mitigation, the jury found that there were no mitigating factors sufficient to preclude the imposition of the death sentence, and the trial court sentenced defendant to death. This court affirmed defendant's conviction and sentence on direct appeal. *People v. Ganus*, 148 Ill. 2d 466 (1992), *cert. denied*, 506 U.S. 1083, 122 L. Ed. 2d 362, 113 S. Ct. 1055 (1993). Defendant subsequently filed a petition under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1992)), seeking relief from his conviction and sentence. Following an evidentiary hearing, the trial court denied defendant's petition and this appeal followed.

The victim, Lucas Gonzales, was killed in his cell at Menard in November 1988. Defendant confessed his responsibility for the crime to Illinois Department of Corrections (Department) officials. According to defendant's statement to the Department officials, on November 5, 1988, he "thought about" robbing and murdering Gonzales in Cell 530. Defendant obtained a knife and fashioned a garrote from pieces of wood and the wire from a broom. The next morning, defendant told the inmates in Cell 523 to be away from their cell in the afternoon. Defendant went to Cell 523 after lunch, waited until Gonzales was alone, and then proceeded to his cell. There, defendant choked Gonzales with the garrote until

Gonzales was unconscious. Defendant reported to authorities that he told Gonzales that "he [Gonzales] raped the wrong 'bitch' out in the street." Defendant explained that he learned this information from other inmates in connection with his job as "cell house security" for the Latin Kings "organization."

Two of defendant's fellow inmates testified at trial that defendant had asked them to leave their cell on the day of the murder, as defendant had indicated in his confession. An autopsy on the victim revealed that the cause of death was asphyxiation due to strangulation and blood loss from stab wounds.

## ANALYSIS

Defendant argues on appeal that the trial court erred in denying his claims seeking post-conviction relief based on the violation of his right to the effective assistance of counsel at sentencing. Defendant argues that trial counsel failed to adequately develop and present mitigating evidence that defendant did not act entirely on his own initiative in the murder of Lucas Gonzales. According to defendant, a "mountain" of evidence was available to demonstrate that the murder was a "concerted gang hit." Defendant argues that the jurors might have been inclined to spare his life if they believed others shared responsibility for the murder. According to defendant, counsel's failure to show the circumstances of the murder left the jurors with the impression that defendant had the cunning and wherewithal to plan and carry out the Gonzales murder by himself. Defendant contends that because trial counsel raised the "gang hit" theory but failed to provide sufficient evidentiary support, the jury may have viewed defendant as deceitful and cowardly in attempting to shift the blame for the killing to others. Defendant also contends that trial counsel was deficient in failing to correct a misimpression created by the prosecution that defendant had killed his earlier victim,

Richard Misslich, in the same manner that he killed Lucas Gonzalez. Finally, defendant faults trial counsel for failing to investigate mitigating evidence of defendant's mental condition.

Claims of ineffective assistance of counsel are evaluated in accordance with the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In order to succeed on such a claim, the defendant must show both deficient performance by counsel and resultant prejudice. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. To establish deficient performance, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. This entails demonstrating that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65.

We will address defendant's contentions in an order different from that presented in his appellate brief. We begin with defendant's claim that trial counsel was ineffective in failing to investigate and present evidence of defendant's mental health and cognitive functioning. In support of his post-conviction petition, defendant submitted a report of a neuropsychological evaluation conducted by Michael M. Gelbort, Ph.D., in 1993. Based on a defendant's background and health history, and the results of neuropsychological testing, Dr. Gelbort observed that defendant was alert, oriented to person, place and time, and appropriate in mood and affect. However, Dr. Gelbort noted that defendant was easily angered and "hypervigilant" to threat, "react[ing] very quickly with little or no intervening thought processes." According to Dr. Gelbort, "[t]his emotional volatility is seen through-

out his history and is consistent with, as well as a likely outgrowth of[,] his neurocognitive deficits and dysfunction." Dr. Gelbort summarized his findings as follows:

"The [test] results show neuropsychologically impaired functioning in a variety of areas including sensory perceptual functioning, motor functioning, learning and memory, and higher cognitive or executive functions. Intelligence scores vacillated significantly with measures of reasoning and judgment being lowest and in the borderline range of functioning. Reasoning and problem solving were in the impaired or cognitively dysfunctional range. Consistent problems with functional attention and concentration were observed. The patient is able to communicate adequately but receptive and expressive language deficits were observed. There is evidence in the protocol and the patient's history of the presence of a language based learning disability, specifically, a dyslexia. The patient shows repeated evidence of neuropsychological impairment and dysfunction. His performance places him in the impaired or dysfunctional as opposed to the normal population."

Defendant also submitted a written psychological evaluation prepared by Harry E. Gunn, Ph.D. Based on his examination and testing, Dr. Gunn observed that defendant had a tendency to be excessively absorbed with his own needs and insufficiently aware of the need of others. Defendant is impulsive, shows poor judgment and has difficulty controlling himself. Defendant yearned for personal relationships with others, but feared rejection and felt "unworthy." Defendant's demanding nature and lack of social skills compound his difficulties in developing relationships. Dr. Gunn noted indications of substantial depression and feelings of futility. Dr. Gunn's report concludes with the observations that, "[d]iagnostically [defendant] shows a Severe Depression Disorder NOS with an underlying Borderline Personality Disorder. He is at times impulsive and particularly with the MMPI-2 shows 'Psychopathic Deviancy.' "

Although defense counsel evidently did not enlist the

services of a practicing psychologist or psychiatrist to evaluate defendant's condition, it is important to emphasize that in other respects defense counsel was extremely well prepared for sentencing. This is not a case where counsel essentially neglected to prepare for sentencing. See, *e.g.*, *People v. Perez*, 148 Ill. 2d 168 (1992). Counsel did not treat the sentencing phase as "a mere postscript to the trial." *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989). To the contrary, the record shows that defense counsel consulted with attorneys experienced in the defense of capital cases, and obtained the assistance of David Randall, a court-appointed mitigation specialist who began his investigation of mitigating evidence months before trial. Although Randall was not a licensed psychologist, he had earned an undergraduate degree in psychology and was nearing completion of his studies for a Ph.D. in clinical psychology. Randall's training involved work in clinical settings and counselling students. Randall investigated defendant's background and compiled a social history which formed the basis of the defense's mitigation strategy.

At the sentencing hearing, defense counsel presented the testimony of several members of defendant's family who related the details of defendant's exceptionally troubled childhood. According to these witnesses defendant endured severe physical and emotional abuse and neglect at the hands of his volatile and domineering father, Kenneth Ganus. The evidence indicated that Kenneth Ganus refused to acknowledge paternity of defendant, claiming that defendant's mother was out "fooling around" and somebody else got her pregnant. Kenneth Ganus referred to defendant as "ugly" and "retarded." Kenneth Ganus also frequently administered severe physical beatings to defendant, his mother and his siblings. In the words of defendant's uncle, Kenneth Ganus "beat [the children], slapped them, kicked them

around." Kenneth Ganus never bought gifts for any of his children except at Christmas, and even then defendant received nothing. Evidence was presented that on two occasions when defendant suffered accidental injuries, Kenneth Ganus neglected or only reluctantly obtained appropriate medical attention for defendant.

Additionally, David Randall testified regarding the results of his investigation of defendant's social history. Randall related information contained in the presentence report prepared in 1986 in connection with defendant's first murder conviction. Randall noted that defendant had withdrawn from public school in 1978 because he was placed in a juvenile facility operated by the Department of Corrections. Department records showed that intelligence testing conducted when defendant was a juvenile indicated an IQ of 81, placing defendant in the "dull-normal" or "low average" range. Testing also indicated the possibility that defendant suffered from dyslexia. According to the Department records of defendant's health history, defendant had once attempted to commit suicide by ingesting Valium. Defendant also had a history of frequently running away from home.

Evidence was presented that defendant had a history of drug and alcohol use reaching back to the age of 12. During a period of incarceration in Missouri, defendant began to "shoot" narcotics (apparently heroin). Defendant's brother, Terry Ganus, picked defendant up after his release and drove him back to Illinois. Terry Ganus testified that defendant's physical appearance scared him: defendant looked "hard and mean" and had lost a considerable amount of weight. During the ride, defendant "bought a couple of bottles of Jack Daniels and just guzzled them." Forty-one days after being released from prison in Missouri, defendant murdered Richard Misslich, and was subsequently sentenced to natural life in prison. While serving that sentence, defendant killed Lucas Gonzales, giving rise to the present case.

Viewing counsel's performance as a whole under the particular circumstances of this case, while it might have been advisable to more fully investigate defendant's psychological or psychiatric condition, we cannot say that the failure to do so constitutes an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. With respect to a defense attorney's duty to investigate, the United States Supreme Court has stated as follows:

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.*" (Emphasis added.) *Strickland v. Washington*, 466 U.S. 668, 690-91, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066 (1984).

Here, counsel undertook an extensive investigation of defendant's social history with the assistance of a court-appointed mitigation specialist trained in psychology. That investigation produced a promising (although ultimately unsuccessful) strategy to show, in human terms, the forces in defendant's life that contributed to his behavior. Under these circumstances, having identified a potentially powerful mitigation strategy,[1] we do not believe counsel acted unreasonably in limiting his

---

[1]We note that although the jury did not spare defendant from the death penalty, defendant's mitigation evidence did have an impact on the jury. Every juror signed a note to the court asking that "some kind of provisions be made to give Jeff Ganus [defendant's 10-year-old brother] a better chance at life."

investigation accordingly. Counsel could make a reasonable decision to base his mitigation strategy on defendant's social history, and could make a reasonable, informed judgment that pursuit of formal psychological and psychiatric evaluations of defendant would not be fruitful.

Defendant argues, however, that trial counsel's decision not to obtain a psychiatric or psychological evaluation was based on a misapprehension of law and cannot be considered a reasonable strategic decision. In our view, the record does not bear out this assertion. During his testimony at the evidentiary hearing on defendant's postconviction petition, defendant's trial attorney was asked whether he considered having defendant evaluated by a psychiatrist or psychologist. Defendant's trial attorney responded, "Not in this particular case because I felt that it could have been counterproductive." Defendant now contends that trial counsel labored under the mistaken belief that the results of any evaluation by a consulting psychiatrist or psychologist would have been available to the prosecution. Defendant's interpretation of trial counsel's remark is sheer speculation. Trial counsel merely indicated that he thought such evaluations might be "counterproductive"; he did not explain why or how. Defendant could have asked trial counsel to elaborate on his answer, but defendant failed to do so, and we decline to adopt his speculative interpretation of trial counsel's testimony.

This court has acknowledged the critical importance of a defendant's background and mental health to the sentencing decision. See *People v. Coleman*, 168 Ill. 2d 509, 537 (1995). It has been observed that "[p]sychiatric mitigating evidence 'has the potential to totally change the evidentiary picture.' " *Baxter v. Thomas*, 45 F.3d 1501, 1515 (11th Cir. 1995), quoting *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir. 1988). Defendant is

certainly correct in noting that the failure or alleged failure to investigate such evidence has figured into decisions of this court ordering some form of relief to defendants in capital cases. See, *e.g.*, *People v. Orange*, 168 Ill. 2d 138 (1995) (cause remanded for post-conviction evidentiary hearing); *People v. Perez*, 148 Ill. 2d 168 (1992) (cause remanded for new sentencing hearing). However, while these decisions provide important guidance, our case law establishes no rigid protocol for case preparation applicable in every capital prosecution. To do so would run afoul of *Strickland*, which noted:

"No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. [Citation.] Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause." *Strickland*, 466 U.S. at 688-89, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Thus, while we continue to emphasize the general importance of psychiatric and psychological evidence, we decline to adopt any *per se* rule as to when an attorney must conduct an investigation into such evidence. Rather, the appropriate inquiry remains whether the decision not to investigate was reasonable given all the circumstances and applying a heavy measure of deference to counsel's judgments. *Strickland v. Washington*, 466 U.S. 668, 691, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066 (1984).

As noted above, trial counsel prepared an extensive case in mitigation based on defendant's social history. The character and extent of counsel's preparation for sentencing sets this case apart from the cases relied on by defendant in support of his argument. See *People v.*

*Thompkins,* 161 Ill. 2d 148 (1994) (defendant was entitled to evidentiary hearing on ineffective-assistance claim, where trial counsel allegedly failed to contact defendant's parents, siblings, children and certain friends, and relied on letters from acquaintances and friends as evidence in mitigation); *People v. Perez,* 148 Ill. 2d 168 (1992) (defendant was entitled to a new sentencing hearing where the only evidence submitted by counsel at sentencing was a report of a Department of Corrections psychologist portraying the defendant in a negative light). In light of all the circumstances of this case, we cannot say that counsel's performance was deficient.

We next consider defendant's claim that counsel's performance was deficient because he failed to adequately develop a mitigating strategy based on the theory that the murder of Lucas Gonzales was a concerted "gang hit." On direct appeal, defendant argued that trial counsel had been ineffective in eliciting prejudicial evidence of defendant's gang ties at the guilt stage in a misguided attempt to establish the legally unavailable defense of compulsion. *People v. Ganus,* 148 Ill. 2d 466, 470-71 (1992). This court rejected the argument, observing that although defendant was not entitled to assert a compulsion defense with respect to the question of guilt or innocence, the gang evidence was relevant in mitigation insofar as it might suggest that defendant was coerced by other gang members to kill Gonzales and may have feared reprisals if he refused to do so.

Defendant now argues that trial counsel did not go far enough in effectuating this strategy. Defendant bases his argument on the written report summarizing the Department's investigation. The report implicates two inmates in addition to defendant—Anthony Perez and Alfredo Hernandez—in the Gonzales murder. The report indicated that Perez had been identified as acting in a possible "security role" during the attack on Gonzales

and had been observed going into Gonzales' cell. In addition, an inmate reported that on the day of the murder, Perez asked him to hold on to a pair of bloodstained jeans. According to the report, Hernandez had been observed with defendant in Cell 523, where defendant, by his own admission, waited before the murder.

Notwithstanding the contents of the Department report, we are unpersuaded by defendant's argument. Needless to say, the possible involvement of other inmates in the murder does not absolve defendant of responsibility for the offense, nor would it necessarily preclude imposition of the death penalty. While the "gang hit"/compulsion theory may have been part of trial counsel's overall mitigation strategy to avoid a death sentence, it is not the function of this court to prescribe, under the auspices of the sixth amendment, the extent to which defense counsel should have emphasized this theory or the manner in which it should have been presented. Rather, these were matters requiring the exercise of counsel's independent professional judgment.

Defendant contends, however, that trial counsel failed to examine the investigation materials, and therefore, the failure to use the information contained therein was not an informed strategic decision. The record does not support this contention. Defendant's trial counsel was called to testify at the evidentiary hearing on defendant's post-conviction petition. During counsel's testimony, the following colloquy occurred:

"Q. When you began to represent Victor Ganus did you have an investigator either in your employ or available to conduct an investigation in this case?

A. Not—you mean—no. Because under the circumstances, especially after the preliminary hearing and the getting the discovery materials through the State's Attorney's Office, from investigating that aspect of it, I think Victor and I were in total agreement with everything that had been presented, be it like in the prelim[inary hearing]

or in the written statements. After that, yes. *But as far as investigating how it happened, hell no. I already knew how it happened.*" (Emphasis added.) Defendant cites the emphasized portion of trial counsel's answer as evidence that counsel had not investigated the circumstances of the murder. While counsel did not conduct an *independent* investigation of the murder, it is abundantly clear from counsel's entire answer that he was familiar with the extensive investigation conducted by the Department. Accordingly, defendant's claim is without merit.

Defendant also faults trial counsel for allowing the prosecution to give the jury the impression that the two murders defendant committed—the murder of Lucas Gonzales in the present case and the prior murder of Richard Misslich—involved the same *modus operandi*: strangulation with a wire. During trial, a Department investigator testified that one of the reasons defendant was suspected of the murder was because "[w]e checked his file for background, indicating he also committed a murder with a wire before, the same style of murder." Defendant contends that this statement was inaccurate because the murder of Richard Misslich involved a stabbing during an armed robbery in which defendant had an accomplice. According to defendant, trial counsel should have corrected this testimony, and the failure to do so allowed the jury to believe that defendant "for the second time had gone off alone and cut his victim's throat with a wire, when the evidence in fact showed that in the first murder he neither acted alone nor used a wire." Defendant's argument is meritless. The Department investigator did not testify that defendant acted alone in the earlier murder. Thus his testimony was not inaccurate in this respect. Additionally, a pathology report concerning Richard Misslich—which appears in the record as an exhibit to defendant's post-conviction peti-

tion—indicates not only the presence of stab wounds, but also "possible ligature strangulation."

Defendant also argues on appeal that the prosecution knowingly used false testimony to obtain defendant's conviction and sentence. Defendant cites the trial testimony of a Department investigator that the investigation produced no physical evidence that anyone other than defendant was involved in the murder. Defendant contends that this is contrary to the Department's investigation report, which indicated that on the day of the murder inmate Anthony Perez had asked another inmate to hold on to a pair of bloodstained jeans for him.

Defendant did not assert this claim of a constitutional violation in his post-conviction petition, and accordingly the issue is waived. We observe that defendant's failure to properly raise the claim below has deprived the State of the opportunity to clarify the apparent discrepancy between the investigator's testimony at trial and the investigative report. Defendant argues that considerations of fundamental fairness require relaxation of the waiver doctrine. We disagree. With due regard for the seriousness of the charge of the knowing use of false testimony by the State, we do not believe that such a charge invariably relieves a defendant of the responsibility to present his or her constitutional claim in an orderly manner in compliance with basic rules of procedure. Moreover, the allegedly false testimony consisted of an isolated remark and was not so significant to the issues in the case as to implicate considerations of fundamental fairness. Accordingly, the claim is waived.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Randolph County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, May 11, 1999, as the date on which the sentence of death entered in the circuit court of Randolph County is to be

carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE HARRISON, dissenting:
For the reasons set forth in my dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). To the extent that the circuit court rejected Ganus' claim that he should be granted a new sentencing hearing, its judgment should therefore be reversed. Ganus' sentence of death should be vacated, and the cause should be remanded to the circuit court for imposition of a sentence other than death.